Robert E. STEVENSON, Plaintiff,

v.

POTLATCH CORPORATION, a Delaware corporation, Defendant.

Civ. No. 85–3122.

United States District Court, D. Idaho.

Dec. 9, 1987.

Roy E. Mosman, Moscow, Idaho, for plaintiff.

Michael E. McNichols, John R. Stegner, Bentley G. Stromberg, Clements, Brown & McNichols, Lewiston, Idaho, for defendant.

MEMORANDUM OPINION
AND ORDER

RYAN, District Judge.

### I. INTRODUCTION

This action is brought by Robert E. Stevenson, former Plant Manager for Potlatch Corporation at its St. Maries, Idaho, plant. Plaintiff alleges that on November 14, 1984, he was forced to take early retirement after a total of eighteen years and four months employment with the St. Maries plant. Plaintiff has set forth eight

claims of relief in his complaint. These claims may be divided into two major categories: (1) age discrimination claims, and (2) contractual claims. The age discrimination claims encompass plaintiff's first, second, fourth and fifth claims for relief. The contractual claims encompass claims three, six, seven and eight.

Now pending before the court for consideration is defendant's Motion for Summary Judgment on all eight claims of plaintiff's complaint; a Motion for Judgment on the Pleadings with respect to the claim for punitive damages pursuant to the Age Discrimination and Employment Act (ADEA), 29 U.S.C. § 621, *et seq.;* and a Motion for Protective Order. A hearing on the pending motions was conducted by the court on November 12, 1987, in Boise, Idaho. All parties were represented by respective counsel.

## II. FACTUAL BACKGROUND

Plaintiff began working for Potlatch Corporation (Potlatch) in May of 1966. In 1974, he was appointed Plant Manager of Potlatch Corporation, St. Maries facility. Plaintiff remained Plant Manager until November 14, 1984, when he took early retirement.

Defendant viewed plaintiff as a satisfactory employee until 1984. Problems first surfaced when a unionization effort by certain employees at the St. Maries plant was initiated. When defendant learned of the unionization movement, it sent several top officials, including Manufacturing Manager Bill Tufts, to St. Maries to investigate. Several meetings were held with St. Maries salaried employees. During those meetings, the officials became concerned with an apparent lack of communication between the hourly employees and salaried employees. This investigation also led to a renewed concern for the safety program at St. Maries.[1]

Based upon the above investigation, Bill Tufts drafted a memo to plaintiff directing him to take certain actions designed to correct the communications breakdown between the salaried and hourly employees. Among other things, the memo required plaintiff to conduct small group meetings every week, as well as bimonthly safety meetings.

In an effort to assist St. Maries in implementing a new safety program, Bill Tufts sent Safety Manager Bill Sanders and Corporate Loss Control Manager Paul McGuire to St. Maries. McGuire and Sanders met with plaintiff and other St. Maries management in May of 1984 to discuss the safety program. It was the opinion of the two safety officials, following the meeting, that plaintiff was unwilling to listen to their suggestions and did not have a high level of commitment to the safety program at St. Maries.

In the summer of 1984, Bill Tufts was contacted by Dr. Donald Feeley, Potlatch Medical Director, concerning alcohol abuse among the St. Maries management. This information had been relayed to Dr. Feeley by Doug Frame of the Panhandle Alcoholism Outpatient Services of Coeur d'Alene, Idaho.

Following this disclosure, Bill Tufts set up a meeting with Dr. Feeley, Doug Frame, and Darrell Daubert, the Employee Relations Manager of Potlatch Corporation. At that meeting, Doug Frame again stated that the St. Maries management had a widespread alcohol abuse problem. Mr. Frame's information had come from Diana Martin, the wife of Joe Martin who was Plant Superintendent at the St. Maries facility.

Bill Tufts subsequently conferred with Diana Martin, who confirmed that she felt there was a substance abuse problem among the St. Maries management. This led to discussions with Potlatch employees Leora Cash, Becky Rogers and John Edwards. These individuals also verified that there was an alcohol problem at the St. Maries facility, as well as continued com-

---

**1.** In 1980, the Safety Coordinator for Potlatch Corporation's Western Division authored a report highly critical of the safety program at the St. Maries plant. In 1982, the St. Maries plant had two separate accidents in which one man was killed and another rendered paraplegic. Plaintiff's performance in the area of safety was rated unsatisfactory in 1982.

munication problems among the salaried and hourly workers.

Based upon the information received from Dr. Feeley, Doug Frame, Diana Martin, and the Potlatch employees, Bill Tufts drafted a memo to plaintiff informing him that he would be placed on probation until February 1, 1985. This memo was dated September 27, 1984, and hand-delivered to plaintiff on October 1, 1984. The memo specifically directed plaintiff to initiate a substance abuse training program for all salaried employees. In that same memo, Bill Tufts instructed Joe Martin that he would either have to undergo substance abuse treatment or be discharged.

Plaintiff subsequently disclosed the memo to the salaried employees at the St. Maries plant, as well as some hourly employees. Bill Tufts believed that plaintiff presented the memo to the employees in such a fashion as to cause division between the St. Maries employees and Potlatch's division management. In a meeting with plaintiff on October 10, 1984, Bill Tufts told plaintiff that he considered his actions in disclosing the memo to be acts of insubordination.

In late October of 1984, Bill Tufts received a telephone call from Gayla Hansen, an hourly employee at St. Maries, who claimed that she had been subject to discrimination and sexual harassment at the St. Maries facility. Hansen had been suspended for a week without pay. Bill Tufts subsequently sent Employee Relations Representative Leora Cash to investigate Hansen's complaint. Hansen explained her complaint and told Cash that several other St. Maries employees would like to speak with Cash confidentially. On November 12–14, 1984, Leora Cash conducted twenty-four interviews with the St. Maries facility employees. Following the investigation, Cash reported several problems, including: threats of dismissal by supervisors, nepotism, cronyism, favoritism, insensitivity to hourly workers and excessive drinking.

On November 13, 1984, plaintiff called Bill Tufts and told him that another effort was being made by the hourly employees to unionize the St. Maries plant. On November 14, 1984, Bill Tufts traveled to St. Maries and informed plaintiff that his employment was being terminated and that he had the option of being discharged or accepting early retirement. Tufts informed plaintiff that he was being discharged as communications were getting worse and that plaintiff was fragmenting the town. The basis for plaintiff's termination was memorialized in an intracompany memo prepared by Bill Tufts on November 13, 1984. This memo cited, among other things, excessive drinking by supervisory and management personnel, labor unrest, and lack of communication with employees.

## III. AGE DISCRIMINATION CLAIMS

### A. Claims under the ADEA and Idaho Human Rights Act

In plaintiff's first claim for relief, it is alleged that defendant violated the ADEA when it terminated plaintiff based upon his age. In count two of the complaint, plaintiff alleges that defendant discriminated against plaintiff on the basis of his age in violation of the Idaho Commission on Human Rights Act (IHRA), Section 67–5901. Plaintiff's state and federal age discrimination claims are subject to the same standards of proof. *Sengupta v. Morrison Knudsen Co.*, 804 F.2d 1072, 1077 (9th Cir.1986).

The standards of proof applicable in an ADEA action are summarized in *Foster v. Arcata Associates, Inc.*, 772 F.2d 1453 (9th Cir.1985):

> [T]he plaintiff, who bears the burden of persuading the trier of fact by a preponderance of the evidence that there has been discrimination, must first make out a prima facie case of discrimination. If the plaintiff succeeds, the duty of going forward shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment decision. Should the defendant succeed in articulating a nondiscriminatory explanation, the plaintiff's advantage is neutralized and the responsibility then reverts to plaintiff to negate the defendant's excuse by showing that the proffered rea-

son is but a pretext for discrimination. This responsibility of preponderating merges with the plaintiff's ultimate burden which is to persuade the court that she has been a victim of intentional discrimination.

*Id.* at 1458–59.

### B. *The Prima Facie Case*

■ As noted in the *Foster* decision, the plaintiff first must make out a prima facie case of discrimination. A plaintiff asserting discrimination under the ADEA may proceed under two alternative theories: disparate treatment or disparate impact. *Id.* at 1458. In the instant case, plaintiff has alleged only a disparate treatment claim. An employee can establish a prima facie case of age discrimination under the disparate treatment theory by showing he (1) was a member of the protected class, (2) was performing his job in a satisfactory manner, (3) was discharged, and (4) was replaced by a substantially younger employee with equal or inferior qualifications. *Palmer v. United States,* 794 F.2d 534 (9th Cir.1986).

■ For purposes of this summary judgment motion, the defendant has assumed that the plaintiff can establish a prima facie case sufficient to withstand a motion for summary judgment. Plaintiff was within the statutorily protected age group, he was discharged, and was replaced by a younger employee. There have certainly been questions raised as to whether plaintiff was actually performing his job in a satisfactory manner. However, plaintiff has submitted affidavits from individuals who were employed under Stevenson that do, at the least, create a genuine issue of material fact with respect to the issue of whether in fact plaintiff was performing his job adequately. The court, therefore, finds that plaintiff has met his burden of producing enough evidence to permit the trier of fact to infer that a prima facie case of disparate treatment did exist. *Id.* at 537.

### C. *Legitimate, Non-discriminatory Reasons for Discharge*

■ Under the standard of proof formula set forth in the *Foster* case, the next step, after a prima facie case has been established, is for the defendant to "articulate some legitimate, nondiscriminatory reason for the adverse employment decision." *Id.* at 1458–59. Defendant must state facts which, if true, would be sufficient to rebut the inference of discrimination.

■ Defendant has submitted a series of affidavits which show a number of areas where the plaintiff was deficient in his work performance as supervisor of the St. Maries plant. Several problem areas have been identified: lack of communication between salaried and hourly employees; labor unrest; excessive drinking by supervisory and management personnel; lack of employee participation in plant safety meetings; insubordination; nepotism, cronyism and favoritism, as well as assertions of sexual harassment. Defendant has made a substantial showing through the various affidavits which, if true, clearly rebut the inference of discrimination. The burden, therefore, returns to plaintiff to demonstrate that defendant's explanation was but a pretext for age discrimination.

### D. *Pretext*

■ A plaintiff can establish pretext in two ways: (1) directly by proving that Potlatch was more likely motivated by discriminatory reasons, and (2) indirectly by showing that Potlatch's rebuttal theory was "unworthy of credence." *Douglas v. Anderson,* 656 F.2d 528, 534 (9th Cir.1981). Plaintiff does not argue that there is direct proof that Potlatch was more likely motivated by a discriminatory reason when it decided to terminate him. Indeed, the record is devoid of any suggestion that Potlatch officials openly had an age-based animus against its employees.

■ This court must, therefore, determine whether there is a genuine issue of material fact with respect to the credibility of the reasons proffered by defendant for terminating plaintiff's employment. It is critical to a proper analysis of the pretext issue that the court not focus on the cor-

rectness of the defendant's reasons for terminating plaintiff's employment. As noted by the court in *Douglas:*

> The focus of the inquiry, at this point, [is] not a determination of whether [plaintiff] was in fact performing his job adequately, but rather, whether there was sufficient evidence of unsatisfactory performance to be a legitimate concern of his employer. This differs from a determination that just cause existed for the termination because of unsatisfactory job performance, which would necessitate a finding that his job performance was unsatisfactory.... [W]e are concerned not with whether [defendant] was correct in its determination that [plaintiff's] job performance was unsatisfactory, but only with whether this was the real reason for the termination and not a pretext for age discrimination.

*Id.,* at 533 n. 5. It is this court's task, therefore, to determine whether the reasons set forth by defendant are worthy of belief, and if so, whether those reasons were the real reasons for plaintiff's termination and not a pretext for age.

■ Plaintiff has submitted an affidavit in support of his opposition to defendant's Motion for Summary Judgment in which he challenges the various reasons set forth by defendant for terminating him. However, a fair reading of plaintiff's affidavit raises a question of fact only with respect to the correctness of the decision to terminate. There are no specific facts which raise a genuine issue of material fact with respect to the legitimacy or believability of the reasons proffered or that such reasons were not the actual reasons for plaintiff's discharge.

### E. *Excessive Drinking Claims*

In the intracompany memo of November 13, 1984, Bill Tufts noted that one of the major problems at the St. Maries plant was excessive drinking by supervisory and management personnel. This followed a thorough investigation of alcohol abuse at the St. Maries plant by Dr. Feeley and Doug Frame. Plaintiff has failed to present any specific facts which suggest that defendant did not legitimately believe that there was alcohol abuse at the St. Maries plant.

It is undisputed that the Plant Superintendent was admitted to the hospital for alcohol abuse treatment following the investigation. Plaintiff has further admitted that it had been his practice to allow workers to call in sick when they were too drunk to work and that exceptional employee performances were awarded with beer. Nor is it denied that in August of 1984 a local church group circulated a petition in St. Maries regarding alcohol abuse among the St. Maries management.

These facts alone give credence to the position of defendant that there was alcohol abuse at the St. Maries plant. Plaintiff appears to assert that the concerns over alcohol abuse stemmed from an overreaction by the church community. It is irrelevant, however, that the concern over alcohol abuse may have been an overreaction by one faction of the community. The only issue is whether the defendant legitimately relied upon the information in deciding to terminate plaintiff from his employment.

### F. *Claims of Union Unrest*

Another concern of defendant was the Union organization drive conducted in the spring of 1984. It is undisputed that the St. Maries plant is a non-Union plant. It is also undisputed that in March of 1984, certain St. Maries workers submitted an invitation to the Industrial Woodworkers of America soliciting that Union's help in organizing the St. Maries workers. Significant efforts were undertaken by various Potlatch managers to quell the Union organization. In November of 1984, plaintiff informed Bill Tufts that another Union organizational attempt was surfacing.

Despite these undisputed facts, plaintiff attempts to persuade the court that the claims of unionization were merely a pretext for plaintiff's dismissal. Plaintiff points out that there were Union organization attempts before he came to St. Maries and that there have been attempts since he was terminated. By this statement, plaintiff appears to be arguing that the Union

organization drives were not the result of poor management on his part. While this may in fact be true, this argument does not refute the position of defendant that there was a legitimate concern for unionization at the St. Maries plant and that such concern was one of the reasons for plaintiff's termination.

### G. *Claims of Employee Dissatisfaction*

Plaintiff also attacks the investigation conducted by defendant following the conversation with Gayla Hansen. Plaintiff asserts that the investigation conducted by Leora Cash was incomplete as she did not interview anyone from the log yard or sawmill, and only one person from maintenance. Plaintiff points out that all the individuals interviewed were from the plywood department and that eight of the individuals testified favorably to plaintiff.

In the case of *Cotton v. City of Alameda*, 812 F.2d 1245 (9th Cir.1987), a similar argument was presented by a plaintiff in an age discrimination case. In that case, a forty-seven-year-old police officer with the Bay Area Rapid Transit Police Department brought claim against the City of Alameda, California, for failing to hire him for a position with the Alameda Police Department. One of the reasons set forth by the City for not hiring plaintiff was that it did not receive encouraging recommendations from those who had worked with plaintiff. Plaintiff attacked this reason by pointing out that defendant's background investigation was incomplete and that if it had conducted a more thorough investigation it would have discovered that plaintiff had a distinguished employment record. The circuit court appropriately noted that for purposes of an age discrimination claim, it was irrelevant that the city's background investigation did not discover all that there was to know about plaintiff. The court noted that the only issue was whether the City legitimately relied upon the unfavorable reports in denying plaintiff's application. *Id.* at 1250.

In the instant case, plaintiff does not dispute that some of the individuals inter-viewed by Leora Cash had unfavorable things to say about plaintiff, nor does plaintiff dispute that defendant relied upon those unfavorable statements in evaluating plaintiff's performance as supervisor at the St. Maries plant. Absent specific facts showing that defendant did not have a legitimate basis for relying upon the statements of employee dissatisfaction, the claim of pretext cannot be supported.

### H. *Lack of Safety*

At oral argument, counsel for plaintiff suggested to the court that defendant's stated concerns for safety at the St. Maries plant were not brought up until well after the litigation was underway. The facts are to the contrary.

On May 3, 1984, Bill Tufts met with the plaintiff to discuss areas of concern regarding the St. Maries plant, including problems with safety at the plant. A memo memorializing the conversation was prepared by Tufts on that same date. The memo specifically provided for the formation of a plant safety committee at the St. Maries facility. On May 11, 1984, Bill Tufts sent Safety Manager Bill Sanders and Corporate Loss Control Manager Paul McGuire to St. Maries to meet with plaintiff and other St. Maries management to discuss the formation of a formal safety program. As previously noted, it was the opinion of the two safety officials following the meeting that plaintiff was unwilling to listen to their suggestions and did not have a high level of commitment to the safety program at St. Maries. Finally in the November 13, 1984, termination memo, one of the specific areas where plaintiff was found to be deficient in managerial leadership was the lack of employee participation in plant safety meetings. The uncontroverted facts show that defendant did have a legitimate concern for the state of plant safety at the St. Maries plant long before plaintiff initiated the instant lawsuit.

This court concludes that plaintiff has failed to satisfy his burden by coming forward with specific facts which raise a genuine issue of material fact with respect to the credibility of defendant's proffered rea-

sons for plaintiff's termination. The facts show that beginning in 1984 certain activities occurred at the St. Maries plant which caused the defendant to have a legitimate concern for the managerial situation at the St. Maries plant. It is not this court's function, in the context of a federal age discrimination claim, to second-guess the business decisions of a defendant.

### I. *Other Claims of Age Discrimination*

As noted supra, plaintiff's fourth and fifth claims for relief in his complaint also set forth claims of age discrimination. In count four of his complaint, plaintiff states that defendant has violated public policy by terminating plaintiff based upon his age. In count five, plaintiff sets forth a breach of contract claim based upon a section of the Potlatch Salary Administration Manual which provided that defendant would not discharge or otherwise discriminate against any individual as to compensation terms. In light of this court's ruling that defendant did not terminate plaintiff based upon age, counts four and five will also be dismissed.

### IV. CONTRACTUAL CLAIMS

The contractual claims in plaintiff's complaint encompass claims three, six, seven and eight. Plaintiff argues that he was not merely an employee at will. He asserts, rather, that he had certain implied contractual rights which required that he be terminated only for good cause.

■ Plaintiff's primary basis for asserting an implied contractual right is based upon the Potlatch Salary Administration Manual that was received by plaintiff in approximately 1972. In the recent Idaho Supreme Court decision of *Harkness v. City of Burley*, 110 Idaho 353, 715 P.2d 1283 (1986), the court held that an employee handbook may constitute an element of an employment contract. For at-will employment status to be converted by a personnel policy manual into a contract of employment, there must be some evidence that the manual was (1) received or requested in relation to job security, and (2)

relied upon as a basis for continued employment. *Spero v. Lockwood, Inc.,* 111 Idaho 74, 721 P.2d 174 (1986). In *Spero,* the court found that an at-will employment situation was not converted into a contract of employment by a personnel policy manual where the employee never relied upon the manual for job security and where the plaintiff never testified that he thought the manual was a contract.

It is clear to this court that the Salary Administration Manual was never intended by the defendant to be used as an employment manual. It was intended to be nothing more than a guide to be used by supervisors and managers to implement salary policy. Moreover, plaintiff never relied upon the manual as a source of continued employment. Plaintiff expressly stated in his deposition that he did not believe that he had an implied contract based upon the provisions of the Salary Administration Manual until *after* he talked with his attorney following his discharge.

■ Plaintiff next asserts that he had an implied contract right based upon specific written stock option agreements which he entered into with the defendant. This argument is also without merit. Each of the stock option agreements contained the following express language: "Nothing in this Agreement shall be construed as giving Employee the right to be retained as an employee or as impairing the rights of the Corporation to terminate his or her employment at any time, with or without cause." *See* Exhibit 31.

■ In his sixth claim for relief, plaintiff asserts that the probation memo of September 27, 1984, contained an implied agreement that if plaintiff took corrective action with regard to the conditions listed in the memo, that he could expect continued employment past February 1, 1985. The assertion that a probation memo constitutes an implied contract for further employment is a rather novel theory and appears to have no basis in law. As noted by defendant, the import of the memo was simply to identify to plaintiff existing deficiencies in his work performance and to

notify him that inaction would result in the termination of his employment.

 Finally, plaintiff states a cause of action based upon the covenant of good faith and fair dealing. In *White v. Unigard Mutual Insurance Co.*, 112 Idaho 94, 730 P.2d 1014 (1986), the Idaho Supreme Court held that, "there is a duty of good faith and fair dealing inherent in every contract...." *Id.* 730 P.2d at 1016. However, where a party, as in this case, has no contract and is merely an employee at will, the implied covenant of good faith and fair dealing does not apply. *Sengupta v. Morrison-Knudsen Co., Inc.*, 804 F.2d 1072, 1077 (9th Cir.1986). Where an employee is merely employed at will, the employer may terminate the relationship at any time for any reason without incurring liability. *Spero v. Lockwood*, 111 Idaho at 75, 721 P.2d 174. The only general exception to the rule is that an employer may be liable for wrongful discharge when the motivation for discharge contravenes public policy. *MacNeil v. Minidoka Memorial Hosp.*, 108 Idaho 588, 701 P.2d 208 (1985). This court has, of course, already found that plaintiff's discharge did not contravene public policy in any way.

## V. ORDER

Based upon the foregoing analysis and the court being fully advised in the premises,

IT IS HEREBY ORDERED that defendant's Motion for Summary Judgment should be, and is hereby, GRANTED. Plaintiff's complaint is, accordingly, dismissed *in toto*.

IT IS FURTHER ORDERED that defendant's Motion for Judgment on the Pleadings with respect to the claim for punitive damages pursuant to the Age Discrimination and Employment Act (ADEA) should be, and is hereby, DENIED as moot.

IT IS FURTHER ORDERED that defendant's Motion for Protective Order with respect to Exhibit No. 33, should be, and is hereby, GRANTED. Exhibit No. 33 shall not be disclosed to anyone outside the parties, their counsel, and court personnel.