ARNOLD PERMAN, Plaintiff-Appellant, v. ARCVENTURES, INC., Defendant-Appellee.

First District (3rd Division)   No. 1—88—3238

Opinion filed March 30, 1990.

Asher, Pavalon, Gittler & Greenfield, Ltd., of Chicago (Donald W. Cohen, of counsel), for appellant.

Edward D. Jepson, Jr., and David J. Rice, both of Chicago, for appellee.

JUSTICE RIZZI delivered the opinion of the court:

Plaintiff-appellant, Arnold Perman (Perman), appeals from the circuit court's order granting summary judgment in favor of the defendant, ArcVentures, Inc. (ArcVentures), as to counts I and II of his complaint.

Count I alleges that the nondisclosure and confidentiality agreement between the parties created a right to continued employment and that ArcVentures breached that agreement when it terminated Perman's employment. Count II alleges that Perman relied upon procedures contained in ArcVentures' manual of personnel policies and procedures as conditions of employment and an inducement to his acceptance of the job. In addition, Perman alleges that ArcVentures failed to administer progressive discipline in accordance with the policies and procedures and thereby treated him unfairly and in bad faith.

ArcVentures is a for-profit subsidiary of Rush-Presbyterian-St. Luke's Medical Center (referred to herein as Rush or Medical Center) which sells prescription services to public entities and private corporations through its Home Pharmacy division (HP). In March 1982, Bioservice, Inc. (BO), ArcVentures' corporate predecessor, hired Perman as director of the Chicago operations for bioservices. At that time, Perman did not sign an employment agreement and no promises were made as to his period of employment. As director, Perman's primary responsibilities were to market and manage the company's phy-

sicians billing system and its Medicaid management system. During Perman's orientation, he received Rush's personnel policies and procedures manual and understood that he would have to administer the policies and procedures with respect to his employees.

In July 1983, Perman's responsibilities changed and he began assisting Bob Bogash, executive director of extended pharmacy services. In early 1984, after Bogash was discharged, Perman accepted his position and understood that the development of new business constituted an important aspect of his position. Initially, Perman reported to Marie Sinioris, president of ArcVentures, but within a few months reported to Thomas Dunlap, vice-president of ArcVentures.

In March 1984, Sinioris requested that ArcVentures' directors sign a nondisclosure and confidentiality agreement. On March 21, 1984, Perman signed the agreement. At this time, Perman understood that he had to satisfactorily perform his job responsibilities. The agreement contained the following language:

"WHEREAS, BSC employs Employee in connection with the identification, development and marketing of BSC products and services to various participants in the health care industry;

WHEREAS, BSC desires to protect confidential information which is essential to the continued existence of its business;

WHEREAS, BSC wishes to continue the employment of Employee so long as Employee abides by the terms and conditions of this agreement;

WHEREAS, Employee wishes to continue its employment with BSC;

NOW, THEREFORE, in consideration of BSC's continuing the employment of Employee, the Employee hereby agrees as follows:

1. NON-DISCLOSURE OF CUSTOMER LISTS. *** The Employee will not, during or after the term of his employment, disclose the list of BSC's customers or any part thereof to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever. In the event of a breach or threatened breach *** BSC shall be entitled to seek an injunction restraining the Employee from disclosing, in whole or part, the list of the employer's customers ***.

2. NON-DISCLOSURE OF BSC'S BUSINESS ASSETS AND INFORMATION RELATED TO CONDUCT OF ITS BUSINESS. The Employee acknowledges that financial costs, sales data and other information including, but not limited to formulas, processes, research, studies, compilations, devices,

computer software, supply sources, knowledge gained from market research *** are valuable, special and unique assets of BSC's business. The Employee will not, during or after the term of his/her employment disclose or in any way exploit any information relating to such assets to any person, firm, ***. Employee will not be subject to non-disclosure of information where such information is within the public domain ***.

3. CONFLICT OF INTEREST. During the term of employment, Employee shall devote his/her best efforts and his/her total time commitment *** to advance the interests of Employer, and Employee shall not without written consent of Employer, directly or indirectly, *** be engaged in or concerned with any other corporation, *** related commercial duties or pursuits that remotely resembles that which is conducted by Employer."

Perman expended a substantial portion of time in late 1984 trying to secure a contract with the City of Chicago. Dunlap and several other employees participated in these efforts. In April 1985, ArcVentures and the city formed a contract, and city employees began utilizing HP's services in July of 1985.

Perman and Dunlap discussed Perman's obligation to develop new business on numerous occasions in late 1984, in 1985 and 1986. During a July 1985 annual review conference, Dunlap stressed the importance of Perman's development of new business and established his performance goals for the coming year.

The prescription volume goals per day were as follows:

August 15, 1985, 300 prescriptions
October 1, 1985, 500 prescriptions
January 1, 1986, 650 prescriptions
April 1, 1986, 800 prescriptions
June 30, 1986, 1,000 prescriptions

Perman did not achieve the August 15, 1985, prescription goal. In a September 1985 meeting with Perman, Dunlap articulated his dissatisfaction that HP was dispensing only 200 prescriptions per day and urged him to obtain additional accounts as soon as possible. In this meeting, Dunlap stated that he wondered whether Perman was "the guy that can sell this product."

During the last quarter of 1985, the prescription volume increased due to the City of Chicago retirees' utilization of HP as previously arranged. No new contracts were executed. Consequently ArcVentures did not meet the prescription goals for October 1, 1985, or January 1, 1986.

In January 1986, Perman and Dunlap met and reduced the pre-

scription goal for June 30, 1986, from 1,000 to 800 since Perman had failed to generate any new accounts. In February 1986, Dunlap and Sinioris informed Perman that they were extremely distressed that the volume of prescriptions had not increased and that no new accounts had been generated.

On or about April 1, 1986, Dunlap directed Perman to expend 100% of his time on marketing, and advised him that he was expected to secure one contract each month in April, May and June in addition to meeting the prescription volume goals.

In April 1986, Perman did not secure any new contracts and the prescription volume goal was not achieved. On May 1, 1986, Dunlap discharged Perman for his failure to meet specific sales goals and to generate new accounts.

ArcVentures utilized Rush's manual of personnel policies and procedures. The manual's introduction states the following:

"The Personnel Policies and Procedures which follow, and which may be modified from time to time by the Medical Center, are meant to provide managers and supervisors with guidance as to how the above-discussed employee relations policy of the Medical Center should be implemented. The Personnel Policies and Procedures do not constitute, modify, or otherwise alter the terms and conditions of employment of any Medical Center employee, do not limit or restrict the right of management to terminate or otherwise discipline any Medical Center Employee, and do not constitute an employment contract with any Medical Center Employee."

The manual provides an employee code of conduct, disciplinary procedures and grievance procedures. The code of conduct section provides that employees are subject to immediate dismissal, even for a first time offense, for major policy violations including, but not limited to, theft, violation of patient privacy or patient-physician confidentiality, forgery, falsification of records, indecent, disruptive or unlawful conduct, assault, fighting, the unauthorized use, possession, or sale of drugs, alcohol and firearms and neglect of duty.

This section provides that for rule violations, the Medical Center may employ any of the following disciplinary actions: verbal warning, written reprimand, suspension, or discharge. The manual provides that "such discharges must be approved in advance by the director of employee relations, or designee, and are subject to employee appeal through established grievance procedures."

The employee grievance procedure section provides that, "It is the policy of the Medical Center to assure every employee of the right

of appeal through an established grievance procedure from an unfavorable decision affecting his employment." The grievance procedure for nonunion employees includes a four-step process, with the employee first discussing the problem or complaint with the immediate supervisor. If there is no satisfactory resolution, the second and third steps provide for the presentment of the issue to the next higher supervisor or manager and the department of employee relations, respectively. The department will initiate a conference, investigate, make findings and issue a decision.

Step four provides the employee with an opportunity to have the director of employee relations present the findings to the assistant vice-president of human resources, who will review the grievance with the vice-president for administrative affairs. During the third and fourth steps, "an employee has the right to support his position with evidence, testimony of others, and third party representation if he or she so desires." This section concludes that the "entire purpose *** is to provide a uniform, methodical system of securing justice for an employee."

Perman submitted his grievance regarding his discharge to Sinioris, who responded that the discharge was justified because Perman had failed to obtain new business other than the City of Chicago. Sinioris further explained that Perman should have anticipated the discharge since he had been repeatedly reminded that the development of new business was imperative to his success at ArcVentures.

Perman appealed Sinioris' decision to James Hill, personnel director of the Sheridan Road Hospital of Rush-Presbyterian-St. Luke's Medical Center. Hill upheld the discharge, finding as sufficient grounds Perman's failure to meet 1985 and 1986 sales goals. In addition, Hill determined that Perman had sufficient notice that he would be discharged if he failed to meet performance expectations.

Pursuant to step four of the grievance procedures, Perman appealed the decision to Wayne Lerner, vice-president of administrative affairs, and Robert Lewandowski, assistant vice-president of human resources. Lerner notified Perman by a September 17, 1986, letter that Perman had adequate notice that if he did not increase sales, he would be discharged and that because there was no significant increase in sales, excluding the increase in volume due to the City of Chicago contract, Perman's discharge was appropriate.

On appeal, Perman first argues that the trial court erred in its summary judgment determination that the nondisclosure and confidentiality agreement between the parties did not establish an enforceable right of continued employment. We disagree.

■■ Covenants not to compete must arise in one of two ways to be enforceable. The agreement may be ancillary to an employment contract or collateral to a sale of property. (*Marathon Petroleum Co. v. Chronister Oil Co.* (C.D. Ill. 1988), 687 F. Supp. 437, 438.) Such covenants are to be carefully scrutinized by the courts. (*Marathon,* 687 F. Supp. at 439.) The starting point for any discussion must be the terms of the agreement itself, and the intent of the parties cannot alone determine the restriction's compliance with the State's public policy. *Marathon,* 687 F. Supp. at 439.

■■ ■ A restrictive covenant entered into between an employer and employee is not favored by the courts. (*Jefco Laboratories, Inc. v. Carroo* (1985), 136 Ill. App. 3d 793, 797, 483 N.E.2d 999, 1001.) It is well settled that a covenant must be reasonable as to time, geographic scope and activity. An unlimited geographic restraint is patently unreasonable. (*Jefco,* 136 Ill. App. 3d at 799.) Here, the nondisclosure and confidentiality agreement is unreasonable and unenforceable given its unlimited geographic and time dimensions.

Additionally, the language does not establish any right to continued employment. The plain meaning of the contract terms required that confidentiality and nondisclosure were the terms of employment. If Perman was to be employed, he would have to agree to the nondisclosure and confidentiality terms. The language did not include any other terms or conditions of employment. *Searight v. Kaiser Aluminum & Chemical Corp.* (N.D. Ill. 1984), 625 F. Supp. 17, 19.

Accordingly, we affirm the trial court's summary judgment ruling that the nondisclosure and confidentiality agreement did not confer upon Perman a right to continued employment. In addition, we modify that order and find that the nondisclosure and confidentiality agreement was unenforceable as a matter of law.

Perman next argues that the trial court erred in granting summary judgment in favor of ArcVentures, finding that the personnel policies and procedures did not create a binding contract. Perman asserts that the disclaimer contained in the policy manual which was not set off from the rest of the text, printed in capital letters or titled, created a genuine issue of material fact as to whether it was effective to preclude a reasonable person from believing the policy manual to be an offer.

■■ ■ The majority of courts interpret the general "employment-at-will rule" as a rule of construction, mandating only a presumption that a hiring without a fixed term is at will, a presumption which can be overcome by demonstrating that the parties contracted otherwise. (*Duldulao v. St. Mary of Nazareth Hospital Center* (1987), 115 Ill. 2d

482, 489, 505 N.E.2d 314, 318.) "[A]n employment handbook *or* other policy statement creates enforceable contractual rights if the traditional requirements for contract formation are present." (Emphasis added.) (*Duldulao*, 115 Ill. 2d at 490.) The language must contain a promise clear enough that an employee would reasonably believe that an offer had been made. The statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. The employee must accept the offer by commencing or continuing to work after learning of the statement. When these conditions are present, the employee's continued work constitutes consideration for the promises contained and a valid contract is formed. *Duldulao*, 115 Ill. 2d at 490.

In *Duldulao*, the employee handbook created an enforceable right to the particular disciplinary procedures described therein given its mandatory terms. For example, the handbook included the following language, "[A]t the end of 90 calendar days from employment the employee becomes a permanent employee and termination contemplated by the hospital cannot occur without proper notice and investigation. (*Duldulao*, 115 Ill. 2d at 490-91.) In addition, permanent employees are never dismissed without prior written admonitions and/or an investigation that has been properly documented and three warning notices within a twelve-month period are required before an employee is dismissed, except in the case of immediate dismissal. *Duldulao*, 115 Ill. 2d at 490-91.

We are mindful that in *Duldulao* the handbook did not contain a disclaimer and that a contract claim may be difficult to maintain when the employee handbook expressly provides that the employment relationship is at will. (*Sitek v. Forest City Enterprises, Inc.* (E.D. Mich. 1984), 587 F. Supp. 1381, 1384.) Nonetheless, we find that the language in Rush's manual of personnel policies and procedures created enforceable contractual rights despite its disclaimer.

Specifically, the manual provided, that "[S]uch discharges *must* be approved in advance by the director of employee relations or designees, and *are subject to employee appeal through established grievance procedures.*" (Emphasis added.) The manual further asserts that, "It is the policy of the Medical Center to *assure* every employee of the right of appeal, through an established grievance procedure from an unfavorable decision affecting his employment." (Emphasis added.) Perman received the manual during his orientation and commenced work after learning of its provisions. Given the unequivocal language, we reverse the trial court's summary judgment ruling and find as a matter of law that Perman's employment could not be terminated at

will insofar as the manual provided for an established grievance procedure for an unfavorable decision affecting employment.

 We find, however, that Rush accorded Perman his contractual rights as provided by the grievance procedures when Sinioris, Hill, Lerner and Lewandowski reviewed the termination decision. We further find as a matter of law that there was just cause for Perman's termination.

Modified and affirmed.

CERDA, P.J., and FREEMAN, J., concur.