596 A.2d 1069

**SUBURBAN HOSPITAL, INC.**

**v.**

**William DWIGGINS.**

**No. 90, Sept. Term, 1990.**

Court of Appeals of Maryland.

Oct. 15, 1991.

S. Allan Adelman, Godard, West & Adelman, P.C., Rockville, both on brief, for petitioner.

Theresa M. Hall, Durke G. Thompson, Goldberg, Thompson, Pasternak & Fidis, P.A., Bethesda, all on brief, for respondent.

Argued before ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, JJ., MARVIN H. SMITH and CHARLES E. ORTH, Jr., JJ., Court of Appeals of Maryland (Retired, Specially Assigned), and RAYMOND G. THIEME, Jr., J., Fifth Judicial Circuit of Maryland (Specially Assigned).

CHASANOW, Judge.

William R. Dwiggins claims that Suburban Hospital, Inc. (Suburban) unfairly fired him from his job as a building maintenance supervisor. He says that he did not receive a fair hearing in the hospital's grievance system, and he wants the courts to make sure he gets one. Suburban counters that Dwiggins received everything he was entitled to through the grievance procedures. Dwiggins won a partial victory in both the trial court and the Court of Special Appeals. *Suburban Hospital v. Dwiggins*, 83 Md. App. 97, 573 A.2d 835 (1990).

Because the case raises important questions on the subject of at-will employment, this Court granted Suburban's petition for certiorari.

### The Facts

Dwiggins had been employed at Suburban Hospital for a decade before the dispute at issue here arose in 1985. When he was hired, there were no discussions about how long he would be employed. His first duties at Suburban were as a carpenter. In 1980, Dwiggins was promoted to building maintenance supervisor, and during the following two years, he was praised for his job performance.

Suburban set forth a number of written policies for employees. Early in 1981, the director of personnel and the hospital administrator signed a policy on disciplinary action that told employees what they could expect from the hospital and created certain requirements that officials had to meet when disciplining employees. For example, an employee's suspension "must be validated by a counseling memo forwarded to the personnel department. All cases of suspension must have prior review by the department head

and division head." If an employee was to be fired, more stringent procedures were to be followed: "Review by the department head, division head, personnel department, and hospital administrator is required for termination of an employee."

A worker aggrieved by a decision of a supervisor could seek review through both an informal and then a formal process that included review by a four-member ad hoc grievance committee. Two committee members would be appointed by the director of personnel; the other two would be chosen by the employee. The grievance committee would then review the issue and inform both sides of its decision within two working days. Either side was given the option of appealing to the hospital administrator.

The process ended with the hospital administrator. According to Suburban's policy and procedure statement, "The administrator will consider the grievance and within five working days decide upon its disposition. The decision of the administrator will be final."

A year later, in 1982, Suburban adopted a "code for employee relations" and promised "to protect the privileges, interests, and benefits of its employees...." In this document, the hospital declared that it would establish written standards for job performance and would "permit and encourage any employee" to present grievances "to the appropriate supervisor for settlement." If the complaint had not been handled to the employee's satisfaction at that level, he or she was promised that the matter would "be dealt with at successively higher levels of management in accordance with an established, written procedure."

The hospital published a reinstatement policy in 1983. In it, Suburban said, "Reinstatement is an offer and acceptance of any position within six months of separation from the hospital." A reinstated employee would "be placed in a three month probationary period."

In 1985, Dwiggins found that a wall being built inside the hospital was going to block an elevator entrance if construc-

tion plans were followed. To solve this problem, he amended the plans on his own by ordering a bend in the wall. When Suburban's associate administrator, Paul Quinn (Quinn), found out, he suspended Dwiggins for three days and recommended that he be fired. Dwiggins' transgressions were four-fold, according to Quinn: (1) he had built the wall without approval from the administration; (2) he had failed to get a building permit; (3) he had spent money without the necessary clearance; and (4) he had not told laboratory personnel what he was doing so that they could protect their equipment.

Dwiggins invoked the hospital grievance procedure. An ad hoc committee decided that he should not be blamed on the first two allegations. Rather than agree that Dwiggins should be fired, the committee recommended that he be placed on probation with a number of specific restrictions. After reviewing the committee's recommendations, the hospital administrator concurred. She warned Dwiggins that he would have to follow written guidelines for his work and that he would be placed on six months probation "with the understanding that any violations of the written guidelines will be grounds for immediate termination."

Dwiggins signed the administrator's letter outlining the restrictions and returned it as requested, agreeing to the terms of his reinstatement. On July 2, 1985, the day he was scheduled to resume work, Dwiggins signed a document entitled, "Performance Conditions," which spelled out specific work rules as follows:

"No construction requiring a building permit may be undertaken without the appropriate signed permit from the County.

No outside contractor can be engaged without signed approval from Administration.

Construction must be coordinated with all departments involved.

No keys may be made or changed without individual and specific approval of the Associate Administrator or the Administrator.

No field changes may be made to any Ward Hale project without specific administrative signed authorization by the Associate Administrator or the Administrator."

The conditions were followed by the warning: "Failure to comply with any of these provisions during the probationary period will result in immediate termination." John Marynowski, Suburban's Director of Engineering/Maintenance and Dwiggins' supervisor, co-signed the document.

Two months later, Marynowski filed a formal "counseling memo" complaining about Dwiggins' performance. He accused Dwiggins of showing "poor judgment in job planning and supervision in completing the renovation of radiology and the installation of the dishwasher...." Specifically, Marynowski said that the job was finished a week late and that the work was badly coordinated by Dwiggins.

On September 16, Marynowski filed another counseling memo saying that, Dwiggins "has again demonstrated poor followup and a lack of concern of his responsibility as a supervisor." The memo was read to Dwiggins.

Finally, on September 26, 1985, Marynowski filed a counseling memo recommending that Dwiggins be fired for failing to abide by the reinstatement agreement he and the hospital administrator signed. Specifically, he accused Dwiggins of violating the condition forbidding him to hire an outside contractor—Peak Sheet Metal—without signed administration approval.

Dwiggins again brought the hospital's grievance system into play, arguing that the accusation was false and that he had not hired Peak Sheet Metal in violation of the reinstatement agreement. Suburban's Personnel Relations Coordinator decided against Dwiggins. In accordance with the grievance procedure, the matter then went to a four-member ad hoc committee, two of whose members were selected by Dwiggins. The proceedings before the ad hoc committee were not recorded. We are informed that Dwiggins was permitted to present a letter from Al Peak of Peak Sheet Metal, but Peak was not called as a witness. Dwiggins also

alleges that he was not present when Quinn was interviewed by the committee. After reviewing the evidence, the committee decided that Dwiggins was accountable even if he had not personally contracted to engage Peak Sheet Metal to work at the hospital. "[S]ince the project was [Dwiggins'] responsibility then it was his responsibility to bring them in," the committee reasoned. "[I]t was [Dwiggins'] responsibility to get written prior approval to bring in the contractor to do the work." Dwiggins, the committee concluded, should be fired.

As required by the grievance procedure, the hospital administrator reviewed the case as well as a letter from Dwiggins' attorney. On November 1, 1985, the administrator wrote Dwiggins a letter saying, "it is my decision that your termination be upheld and that you not be reinstated."

Dwiggins then filed a breach of contract action, contending in part that Suburban had breached a contractual duty to follow the grievance procedures the hospital had established for employees. He also argued that the written reinstatement agreement he had signed was a legally enforceable contract and that the hospital dismissed him in violation of the agreement's terms. Suburban countered that Dwiggins was an at-will employee and the reinstatement agreement did not change that status. The hospital also argued that the grievance procedures it established had been followed to the letter; therefore, Suburban said, Dwiggins could be fired at its pleasure.

In essence, Dwiggins has two basic complaints: (1) he should not have been fired except for just cause because the reinstatement agreement showed that he was not an at-will employee, and (2) the grievance process was unfair.

After a trial in the Circuit Court for Montgomery County, a jury awarded damages to Dwiggins totalling $35,809, an amount later reduced by stipulation to $31,259, for breach of contract based on the reinstatement agreement. On appeal, the Court of Special Appeals held that the reinstatement agreement constituted a legally enforceable contract

between Dwiggins and Suburban. But the intermediate appellate court remanded the case for a determination whether the grievance process used by the hospital was "fundamentally fair" and whether "the rules governing it [had been] substantially followed...." 83 Md.App. at 118, 573 A.2d at 846.

The Court of Special Appeals held that "[t]he reinstatement agreement certainly was a contractual undertaking." 83 Md.App. at 109, 573 A.2d at 841. "Considering that agreement together with the underlying policies that authorized and led to it, we have no hesitation in concluding that the hospital did, in fact, contractually limit its otherwise vast discretion to discharge Mr. Dwiggins at any time and for any reason." *Id.*

By agreeing to a formal set of "performance conditions" in the reinstatement agreement, the Court of Special Appeals reasoned,

"the hospital implicitly, but contractually, assured Mr. Dwiggins that he would not be disciplined for job conduct that was consistent with and not violative of those conditions. If this were not so—if the undertaking did not have that effect—it would be merely a sham, and there is no evidence that the hospital ever intended it as such."

83 Md.App. at 110, 573 A.2d at 842. The intermediate appellate court also viewed Suburban's grievance system as a neutral arbitration designed to fairly and conclusively resolve employee complaints. "In creating such a dispute resolution mechanism and committing itself to abide by it, the hospital necessarily ceded a certain measure of its discretion to make snap and final judgments in this area." *Id.* The Court of Special Appeals held that, in order for a grievance procedure to be final and binding, it must be "fundamentally fair." That court remanded for the lower court to hold an evidentiary hearing and "[i]f the court finds that the proceeding was fundamentally fair and that the rules governing it were substantially followed, it should dismiss the action against the hospital." 83 Md.App. at 118, 573 A.2d at 846.

■ In Maryland, at-will employment is an employment contract of indefinite duration. It can be legally terminated at the pleasure of either party at any time. *Adler v. American Standard Corporation,* 291 Md. 31, 35, 432 A.2d 464, 467 (1981). H.G. Wood, *A Treatise on the Law of Master & Servant* (1877), a late 19th Century work on employment law, has been credited with bringing the at-will rule to national attention, though cases adopting the doctrine can be found even earlier. *See* S. Mazaroff, *Maryland Employment Law,* § 1.8 at 50–54 (1990). The doctrine was born during a laissez-faire period in our country's history, when personal freedom to contract or to engage in a business enterprise was considered to be of primary importance. *See* Love, *Greeley v. Miami Valley Maintainance Contractors, Inc.: Has Ohio Gone Too Far in Creating a Public Policy Exception to the Employment At Will Doctrine?,* 18 N.Ky.L.Rev. 543, 544–47 (1990); Massingale, *At–Will Employment: Going, Going ...,* 24 U.Rich.L.Rev. 187, 188–89 (1990).

There are exceptions to the general rule that at-will employees can be terminated at any time for any reason. As we discussed in *Adler,* an at-will employee has a cause of action in tort if his discharge "contravened some clear mandate of public policy." 291 Md. at 43–47, 432 A.2d at 471–73. *See Ewing v. Koppers Co.,* 312 Md. 45, 537 A.2d 1173 (1988). Various statutes also restrict an employer's right to terminate at-will employees. For example, if an employer discharges an employee who has filed a workers' compensation claim, he is guilty of a misdemeanor. Maryland Code (1991), Labor and Employment Article, § 9–1105. An employee cannot be fired as a result of time lost from work because he served on a jury. Md.Code (1974, 1984 Repl.Vol.), Courts and Judicial Proceedings Art., § 8–105.

■ It is apparent that Dwiggins was an at-will employee at Suburban Hospital, at least when he began work with the institution in 1975. But the Court of Special Appeals read into the reinstatement agreement an assurance that Dwiggins would not be disciplined as long as his work did not

violate the agreement's "performance conditions." 83 Md. App. at 110, 573 A.2d at 842. In other words, whatever Dwiggins' status was before the reinstatement agreement, that document liberated him from being an at-will worker. In effect, that means that after July 2, 1985, the date he signed the agreement, Dwiggins could be fired only for cause. We do not believe that the parties intended to make Dwiggins harder to fire when they signed an agreement intended as part of a disciplinary action.

The "performance conditions" listed in the reinstatement agreement serve one purpose: They tell Dwiggins what he should be particularly careful about in light of his prior problems with the administration. They are not to be read as setting forth the only transgressions that could lead to Dwiggins' discharge. As one court noted: "The assertion that a probation memo constitutes an implied contract for further employment is a rather novel theory and appears to have no basis in law. As noted by defendant, the import of the memo was simply to identify to plaintiff existing deficiencies in his work performance and to notify him that inaction would result in the termination of his employment." *Stevenson v. Potlatch Corporation*, 674 F.Supp. 1410, 1417–18 (D.Idaho 1987), *aff'd*, 874 F.2d 816 (9th Cir.1989). At oral argument, Suburban's counsel made an apt analogy: Suppose a parent tells a teenager that if he puts one more dent in the family car, he won't be allowed to drive it again. That warning could not possibly mean that denting the automobile has suddenly become the only basis for denying the youngster the use of the car.

Employee handbooks often list transgressions that can result in discipline. Unless there is evidence to the contrary, such lists should not be read as being exhaustive. *See Novinger v. Eden Park Health Services*, 167 A.D.2d 590, 563 N.Y.S.2d 219, 220 (N.Y.App.Div.3d 1990) (grounds for termination in manual not exhaustive), *appeal denied*, 77 N.Y.2d 810, 571 N.Y.S.2d 913, 575 N.E.2d 399 (1991); *Gagné v. Northwestern Nat. Ins. Co.*, 881 F.2d 309, 317 (6th Cir.1989) (handbook gave fifteen specific situations

"which may warrant immediate discharge without warning"; these acts were not the exclusive permissible grounds for discharge and plaintiff could be terminated for "poor performance"); *Johnston v. Panhandle Co-op Ass'n,* 225 Neb. 732, 741, 408 N.W.2d 261, 268 (1987) (although handbook gave examples of good cause for discharge, it did not limit the reasons for dismissal to those examples); *Hinson v. Cameron,* 742 P.2d 549, 555–56 (Okla.1987) (handbook contained extensive list of offenses for which employees could be discharged, but it was not exhaustive and thus did not constitute the basis for an implied contract to discharge only for good cause); *Enis v. Continental Illinois Nat. Bank,* 795 F.2d 39, 42 (7th Cir.1986) ("The language [listing serious infractions that could result in immediate termination] cannot sensibly be limited to the instances given. That would imply that if an employee murdered a coworker he could not be immediately dismissed, because he was not being insubordinate, or stealing, or drug dealing."). We hold that the reinstatement agreement did not restrict the bases on which the hospital could terminate Dwiggins.

■ Although the reinstatement agreement and the personnel policies did not limit the grounds upon which the hospital could discharge Dwiggins, the personnel policies may have limited the procedures which the hospital could use to discharge him. *See Carnes v. Parker,* 922 F.2d 1506, 1511 (10th Cir.1991) ("Although procedural protections themselves are not sufficient to create a property interest in continued employment, they can sustain an entitlement to the procedures themselves."); *See also Perman v. ArcVentures, Inc.,* 196 Ill.App.3d 758, 143 Ill.Dec. 910, 915, 554 N.E.2d 982, 987 (1990).

■ Dwiggins contends that the hospital did not live up to the contractual obligations it created when it published various employment policies. There is no doubt that, in its policy and grievance statements, Suburban made promises to Dwiggins and other employees that the hospital was contractually required to keep. "[E]mployer policy di-

rectives regarding aspects of the employment relation become contractual obligations when, with knowledge of their existence, employees start or continue to work for the employer." (Citations omitted). *Dahl v. Brunswick Corporation*, 277 Md. 471, 476, 356 A.2d 221, 224 (1976). If an employee is not afforded the job termination procedures outlined in a handbook, the employee may have a breach of contract action against employer. *See Pine River State Bank v. Mettile*, 333 N.W.2d 622, 630–31 (Minn.1983); *Cassel v. Ancilla Development Group, Ltd.*, 704 F.Supp. 865, 866–67 (N.D.Ill.1989); *Cf. Land v. Michael Reese Hospital and Medical Center*, 153 Ill.App.3d 465, 106 Ill.Dec. 470, 472, 505 N.E.2d 1261, 1263 (1987) (employee entitled to grievance procedure spelled out in handbook); *Toussaint v. Blue Cross & Blue Shield of Mich.*, 408 Mich. 579, 292 N.W.2d 880, 892 (1980) (if employer establishes personnel policies and practices, it has created obligations). The question, therefore, is what Suburban promised and whether Dwiggins was given what was due him.

"[A]s a general rule, the construction or interpretation of all written instruments is [initially] a question of law for the court...." *Gordy v. Ocean Park, Inc.*, 218 Md. 52, 60, 145 A.2d 273, 277 (1958). *See also Rothman v. Silver*, 245 Md. 292, 296, 226 A.2d 308, 310 (1967) ("If a written contract is susceptible of a clear, unambiguous, and definite understanding, ... its construction is for the court to determine."); and *University Nat'l Bank v. Wolfe*, 279 Md. 512, 521–22 n. 7, 369 A.2d 570, 575 n. 7 (1977) ("When writings alone evidence a contract, it is for the court to construe the writings, and determine whether there was a contract, and, if so, what that contract was.") *See also Keyworth v. Industrial Sales*, 241 Md. 453, 456, 217 A.2d 253, 255 (1966).

If there is an ambiguity in a document, the drafter—in this case, Suburban—will have the ambiguity construed against it. "[A]mbiguities in an instrument are resolved against the party who made it or caused it to be made, because that party had the better opportunity to understand

and explain his meaning." *King v. Bankerd*, 303 Md. 98, 106, 492 A.2d 608, 612 (1985). *See also Truck Ins. Exch. v. Marks Rentals*, 288 Md. 428, 435, 418 A.2d 1187, 1191 (1980); *Biskupich v. Westbay Manor Nursing Home*, 33 Ohio App.3d 220, 515 N.E.2d 632, 634 (1986) (If the employer was responsible for drafting an employee manual, the terms of the manual will be strictly construed against the employer).

By creating and disseminating its grievance procedures, Suburban promised merely that they would be followed. A similar situation arose in Hawaii in the case of Edwing P. Pagdilao (Pagdilao), who was fired from his job as a bellman at the Maui Inter–Continental Hotel. *Pagdilao v. Maui Inter–Continental Hotel*, 703 F.Supp. 863 (D.Hawaii 1988). Pagdilao, an at-will employee, had drunk too much beer at two employee picnics. At the second gathering, he ran afoul of the hotel's security director, who then recommended that Pagdilao be fired for insubordination and swearing. The hotel's grievance mechanism—known as the Kokua Procedure—was brought into action. At the conclusion of the process, Pagdilao was fired. Pagdilao filed suit contending in part that he had an implied-in-fact contract with the hotel based on his employee handbook.

The court rejected his argument, saying that Pagdilao "was given all that was promised to him in the Employee Handbook." 703 F.Supp. at 867. In granting the hotel's motion for summary judgment, the court observed: "The only promise to employees is that they will be permitted to pursue the Kokua Procedure." *Id.* The hotel followed the procedure; consequently, the employee handbook provided no basis for liability. In the case before us the hospital lived up to its obligations to Dwiggins by acting in accordance with every step in its grievance system. Having done that, Suburban owed Dwiggins nothing more. *See Carnes*, 922 F.2d at 1511–12 (employee had right to grievance procedures, not continued employment: "We are convinced the Hospital gave Carnes all the process to which she was entitled based on the personnel manual *plus much more.*"

(Emphasis in original.)); *Perman,* 143 Ill.Dec. at 915, 554 N.Ed.2d at 987 (Employee manual created contractual right to an established grievance procedure which employer followed.); *Meleen v. Hazelden Foundation,* 740 F.Supp. 687, 692 (D.Minn.1990) ("Plaintiff got all the procedure she was due under the employment contract. She, perhaps understandably, would like something more. But, this was a private contract; no right to constitutional due process or proof beyond a reasonable doubt existed. Plaintiff's private expectations and due process concepts are not part of the employment contract."), *aff'd,* 928 F.2d 795 (8th Cir. 1991); *Goodlett v. Blue Cross and Blue Shield,* 234 Neb. 5, 449 N.W.2d 9, 11–12 (1989) ("The employer did not breach the employment contract because the employer followed the disciplinary procedure contained in the handbook."); *Plummer v. Humana of Kansas, Inc.,* 715 F.Supp. 302, 304 (D.Kan.1988) ("Even if an employment contract did exist, Plummer would certainly be bound by that contract's terms. The Handbook provided that if an employee felt Humana had violated its own policies, the employee's sole recourse was to use the grievance procedure."); *Salanger v. U.S. Air,* 611 F.Supp. 427, 431 (D.C.N.Y.1985) (all contractual obligations relating to employee's discharge were met where grievance procedures provided a forum to appeal termination-for-cause decisions and were made available to employee); *Grozek v. Ragu Foods, Inc.,* 63 A.D.2d 858, 406 N.Y.S.2d 213, 214 (1978) ("Assuming that the handbook represents a binding agreement between plaintiff and defendant, plaintiff must be held to have accepted the complaint procedures provided for therein and the rules by which his actions were to be judged.").

### Fairness of the Grievance Process

In holding that Suburban's grievance procedures were legally required to be fundamentally fair and unbiased, the Court of Special Appeals treated the hospital's disciplinary system as if it were an arbitration designed to be the final resolution of the issues presented to it. 83

Md.App. at 113–18, 573 A.2d at 843–46. But it was not meant to be so. The system was not a binding arbitration agreement; it was merely a mechanism established by the hospital to give employees an opportunity to complain about disciplinary actions.

Suburban's policy set out the procedures Dwiggins was entitled to have followed. Dwiggins is not entitled to have the court impose additional requirements. Dwiggins was still an at-will employee. Adding the element of general fairness and due process to the grievance procedure alters this at-will status, and care should be taken before a court decides that the parties intended such a result. *Cf. Sullivan v. Snap-on Tools Corp.*, 708 F.Supp. 750, 753 (E.D.Va. 1989) ("An employer's promise to discharge an employee only for just cause should be explicit and unambiguous, and such an intent should be clearly expressed."), *aff'd*, 896 F.2d 547 (4th Cir.1990).

 Although we have generally implied a covenant of fair dealing in negotiated contracts,[1] there is no implied covenant of fair dealing with regard to termination by either side in an employment-at-will. The employer or employee may terminate "at-will" even though to do so might be unfair to the other. Any modifications to the employment relationship in the instant case were self-imposed by the employer and unilateral. The employees remained free to quit the employment at any moment for any reason, and no grievance procedure would be available to the employer. If an employer unilaterally adds specific limitations or conditions on the right to terminate at-will, those specific limitations or conditions should be enforced by the courts, but they should not be expanded by the courts. Specific modifications to the at-will relationship

---

1. *See, e.g., Julian v. Christopher*, 320 Md. 1, 9, 575 A.2d 735, 739 (1990); *Food Fair v. Blumberg*, 234 Md. 521, 534–36, 200 A.2d 166, 174–75 (1964); *Automatic Laundry v. Demas*, 216 Md. 544, 550–55, 141 A.2d 497, 500–01 (1958); 5 *Williston on Contracts*, § 670 at 159 (3d ed. 1961).

should not be an indication that the employer intends to go beyond the specific modifications and add an implied covenant of fair dealing to the at-will relationship.

An employer may limit his right to terminate a worker by establishing virtually any disciplinary procedure. But courts must not read more into the procedure than is there. Unless some public policy is implicated, employee grievance mechanisms should be analyzed only for what they offer; they must not be seen automatically as quasi-judicial forums for final and impartial dispute resolution governed by standards of due process and neutral fairness.

To the extent that we are asked to impose a general requirement of good faith and fair dealing in at-will employment situations, we decline the invitation. "[A] small number of courts have implied a covenant of good faith and fair dealing into employment contracts.... The majority of courts confronting the issue, however, have refused on both policy and analytical grounds to imply any version of the covenant of good faith and fair dealing into employment contracts." Note, *Reversing the Presumption of Employment at Will*, 44 Vand.L.Rev. 689, 699 (1991). It would "amount to the judicial imposition of a collective bargaining agreement, a move best left to the legislature." *Id.* at 700. "Because at-will agreements allow an employer to discharge an employee for bad cause, the covenant would impose a duty on the employer to use good faith in making bad cause discharges, a proposition that is merely a semantic step away from a flat contradiction." *Id.* *See also Morris v. Coleman Co., Inc.*, 241 Kan. 501, 738 P.2d 841, 849–51 (1987) (surveying states that have considered the question and observing that "the principle of law stated in *Restatement (Second) of Contracts* § 205, that every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement, is overly broad and should not be applicable to employment-at-will contracts"); *Fogel v. Trustees of Iowa College*, 446 N.W.2d 451, 456–57 (Iowa 1989) ("The majority of jurisdictions that

have addressed the [implied] covenant [of good faith and fair dealing in employment contracts] have unequivocally rejected it."); Note, *Wrongful Termination of the Employment–At–Will Rule in California: DeHorney v. Bank of America,* 35 DePaul L.Rev. 907, 908 (1986) ("California and a small minority of other jurisdictions recognize the most liberal exception to the employment-at-will rule and impose a duty of good faith and fair dealing on the employer-employee relationship.").

Because we find that the grievance procedures were followed and there is no need to go further and require that they also be "fundamentally fair," we hold that the trial court should have granted Suburban's motion for judgment on Dwiggins' contract claim.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR ENTRY OF JUDGMENT IN FAVOR OF PETITIONER. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.