HELEN TRINQUE *vs.* MOUNT WACHUSETT COMMUNITY
COLLEGE FACULTY ASSOCIATION.

Worcester.  May 7, 1982. — July 19, 1982.

Present: GRANT, CUTTER, & BROWN, JJ.

*Arbitration,* Discretion of arbitrator.  *Labor,* Fair representation by
union.

Discussion of a labor union's duty of fair representation of its members in
connection with grievance proceedings under a collective bargaining
agreement.  [197-199]
In an action against a labor union alleging inadequate representation, bad
faith, and arbitrary conduct by the union in connection with certain
grievances concerning the plaintiff's employment as a nontenured fac-
ulty member at a community college, the trial judge properly left to
the jury the decision whether there was substantial evidence of bad
faith or discriminatory conduct in the union's representation of the
plaintiff.  [200-202]

CIVIL ACTION commenced in the Superior Court on Sep-
tember 16, 1977.

The case was tried before *Mulkern, J.*

*Charles K. Bergin, Jr.,* for the defendant.

*Gregory J. Angelini* for the plaintiff.

CUTTER, J.  Mrs. Trinque, by her complaint filed Septem-
ber 16, 1977, and amended in November, 1980, seeks to re-
cover damages from the defendant association (the Associa-
tion) based on (a) the alleged inadequacy of the Association's
representation of her (under a collective bargaining agree-
ment in force in 1974 and 1975) and (b) its alleged bad faith
and arbitrary conduct in connection with her 1974 and 1975
grievances concerning her employment as a (nontenured)
assistant professor in the nursing division at Mount Wachu-
sett Community College (the College).  The case was tried
before a Superior Court judge and a jury in June, 1981.

There was a verdict (1) for Massachusetts Teachers Association (MTA), originally also named as a defendant, and (2) for Mrs. Trinque against the Association in the sum of $8,000. In its appeal from the judgment against it, the Association contends that the trial judge improperly denied its motions for a directed verdict and its motion for judgment notwithstanding the verdict.

In September, 1972, Mrs. Trinque (despite the fact that she had no master's degree and that the College was looking for nurses with such a degree) was given a one-year appointment to the College's nursing faculty. Under this appointment, on a year to year basis, she could be designated for three successive years. At the end of the first year, Mrs. Trinque had been reappointed to serve during the academic year 1973-1974 with an increase in pay.

In May, 1974, the College and the Massachusetts Board of Regional Community Colleges (the Board) entered into a collective bargaining agreement with the Association. This contract provided the procedure for annual evaluations of professional staff. Mrs. Trinque, after May, 1974, was evaluated by methods which purported to comply with the new procedure. On October 2, 1974, she was informed by Professor Banks, chairman of her department, that he was not going to recommend her for reappointment for the next academic year.

Under the collective bargaining agreement, the Association was in 1974-1975 "the exclusive bargaining agent for the faculty at" the College and was a direct affiliate of MTA, which (upon request of the Association) would provide assistance and consultation services. These included (where a grievance involved the termination of an employee) the provision (without cost) of a lawyer to represent the grievant in arbitration.

Shortly after Mrs. Trinque's talk with Professor Banks, she went to Theodore Filteau, then president of the Association. He arranged for her to meet two days later with himself, Gerard O'Brien, an active member of the Association, and Eduardo Robreno, an experienced representative of the

MTA.[1]  Mrs. Trinque had not participated in a grievance procedure before but, with the others, she put together a so called written "grievance" to be filed with the College.  The grievance raised questions about the student evaluation, the "peer" evaluation, and the failure of Professor Banks to make his own "separate written observations" of Mrs. Trinque's performance.

The collective bargaining agreement provided for a grievance procedure in five steps:  *Step 1.*  A written grievance could be submitted to the grievant's immediate supervisor.  *Step 2.*  If the supervisor did not grant relief, the grievance could be presented to the appropriate dean.  *Step 3.*  If the grievance remained unsettled, it could be presented in writing to the president of the College.  *Step 4.*  If still unsettled, it could be presented to the president of the Board.  *Step 5.*  If the grievance was not settled at Step 4, either party (i.e., the College or the Association) might refer the matter to arbitration.  This procedure was followed in Mrs. Trinque's case.  Robreno and the Association prepared and assisted her at the local level on her 1974 grievance through Steps 1, 2, and 3.  A hearing before Dr. Dwyer, the president of the Board was set for late January, 1975, in Boston.  Mrs. Trinque had to visit her daughter (then expecting her first child) in Missouri at that time, and the Association obtained a continuance of the hearing until March 13.  At that hearing, Robreno and Peter Trainor, the Association's new president, represented Mrs. Trinque.  In each of these steps, Mrs. Trinque's contentions were rejected and she was notified that she would not be reappointed.  The Association prepared and filed for her a petition for arbitration.  It also retained and paid to represent her an attorney, Mr. John Egan, who had significant experience in labor and arbitration matters.  She conferred with him on various occasions prior to the arbitration hearing at which Mr. Egan appeared

---

[1] Robreno was a consultant in labor matters who held a master's degree in economics and was a graduate of the labor center of the University of Massachusetts.

for her and during which he filed a substantial twenty-three page brief with the arbitrator.

The arbitrator ruled that "all of the items [of Mrs. Trinque's 1974 grievance] taken together" amounted to "a failure . . . of the College to discharge its implied obligation of fairly implementing the evaluation procedure" set out in the collective bargaining agreement. Although Mrs. Trinque and the Association had requested reinstatement with full back pay and benefits, the arbitrator decided that remedies, beyond a declaration of the College's violation of the collective bargaining agreement, were not "appropriate." Stated reasons for this conclusion included (a) the circumstance that the evaluation procedure became effective only in September, 1973, so that "the 1973-1974 academic year was the first for which . . . [Mrs. Trinque] could be evaluated under the new procedure," (b) the College in September, 1974, was not required to give Mrs. Trinque "a chance to prove herself during 1974-1975," (c) "the Association knew or should have known that the evaluation procedure was not being followed," but delayed for some time "before filing a grievance," (d) Mrs. Trinque had been "an active and knowing participant in the very conduct of which she complains, that is, the use of substitute members of the . . . peer evaluation committee."[2] As to the broad discretion of an arbitrator in determining remedies for violations, see *Wachusett Regional Dist. Sch. Comm.* v. *Wachusett Regional Teachers Assn.*, 6 Mass. App. Ct. 851 (1978), and cases cited. Courts, of course, "should not undertake to review the merits of the grievance decision rendered by the arbitrator." *Berman* v. *Drake Motor Lines, Inc.*, 6 Mass. App. Ct. 438, 442 (1978), and cases cited.

---

[2] This last conclusion (d) referred to the circumstance that "[i]nstead of being evaluated by the [d]ivisional peer evaluation committee of which . . . [Mrs. Trinque] was not a member, she was evaluated by a substitute committee which included herself and which agreed, when it sat down to fill out the peer evaluation forms, that the three evaluations would be favorable and substantially identical."

Prior to the arbitration hearing and decision on the 1974 grievance, a 1975 grievance was filed on the recommendation of Peter Trainor of the Association and with his assistance. This was based in part on alleged "reprisals" against Mrs. Trinque by the College for initiating or participating in a grievance. This grievance proceeded through Step 3 of the grievance procedure and, at each stage, relief was denied. Trainor, for the Association, had represented Mrs. Trinque before her supervisor, the dean, and President Haley of the College. A hearing was to have been held in Boston before the president of the Board, Dr. Dwyer. By agreement, that Step 4 hearing was postponed until after the arbitration, because it was thought that "many of the issues might surface during arbitration" and be resolved. The arbitrator's decision on the 1974 grievance was announced on June 2, 1976.

Mrs. Trinque finished her work at the College in June, 1975. She went to work at lower pay at Fitchburg State Teachers College in September, 1975, and remained there until January, 1980. Two to three weeks after the arbitrator's decision, however, she decided to hire independent counsel to pursue her case against the College for not reappointing her. Trainor and the Association became aware of this.

Mrs. Trinque appears to have relied, in general terms, upon the following matters as constituting failure on the part of the Association to represent her appropriately.

(a) Dean Bassett at the hearing before him on the 1974 grievance had spoken to her "in very loud words" and said "that he had wanted to get rid of . . . [her] in the first year" because, although she "had been given a perfectly good evaluation for . . . [her] first year performance," she had "tried to make something out of it" and had complained to the dean about Banks, her supervisor. She had reported this incident to Filteau of the Association but this, she says, did not result in the Association's filing for her a "reprisal" grievance or in any suggestion that she do so.

(b) She contends that the Association did not prepare her at all for the Step 4 meeting before Dr. Dwyer on her 1974

grievance, although she admitted at trial that Trainor, the new president of the Association and Robreno were present.

(c) She also contends that her 1974 complaint (viz. that Banks, her division chairman, had not made "his own written observations" about her, as required by the collective bargaining agreement) was not pursued at or beyond Step 4 of the grievance procedure. She lays stress upon the fact that Trainor and Professors Tandy and Leasure, through the Association's efforts, had obtained destruction of the 1974 evaluations of them, respectively, as a settlement of essentially this same grievance.[3] She points to her testimony concerning a talk with Trainor in June, 1976, after the arbitrator's decision, when she asked him why in July, 1975, her evaluation "wasn't thrown out along with" his own (and that of Filteau, Tandy, and Leasure). His reply was, "To be honest with you . . . you had left the College and we just forgot about you." The evidence showed that on July 23, 1975, the College and the Association had made a written memorandum agreement about the grievances of tenured faculty concerning their 1974 evaluations. The memorandum recited "that further delay in the hearing of the three grievances would only cause continued strain upon [the College's] labor-management problems" and that "[n]o economic benefit could accrue to any party" (presumably because each of these grievants already had tenure). In consideration of their withdrawal of their 1973-1974 grievances, their evaluations were to be removed from the College's personnel files, and no further evaluations for that academic year were to be made.

---

[3] Her argument is that, if her evaluations which were discussed in the 1974 grievance had "been destroyed, she would have been entitled under the [c]ollective [b]argaining [a]greement to have been rehired for another year with an increment in salary." This assumption, in view of the circumstances that her grievance had gone to arbitration (and was not dealt with by the State Labor Relations Commission) may be unwarranted even under cases like *Southern Worcester County Regional Vocational Sch. Dist.* v. *Labor Relations Commn.*, 386 Mass. 414, 423-424 (1982). See G. L. c. 150E, § 8, as amended through St. 1978, c. 393, § 39.

(d) Mrs. Trinque also asserts that her 1975 grievance mentioned "reprisals" against her by the College during her third year of service, in addition to failure to comply with prescribed evaluation procedures. One "reprisal" alleged was that her supervisor, Professor Banks, had placed a reprimand in her file for being absent without leave from the College although he previously had given her permission to go to Missouri to see her daughter. Another was that at her 1975 Step 1 hearing, Professor Banks "had said that he had gotten rid of" her, feeling that "he was threatened because . . . [she] had gone to the dean."[4] She asserted further that during the steps of the 1974 grievance process, no union representative had advised her to file another grievance about a reprisal against her.

1. The authorities concerning the duty of representation (as to employee grievances) of a collective bargaining agent or union have largely arisen in the Federal courts and in the context of Federal legislation. The decisions are collected in 6 Kheel, Labor Law c. 28 (1982). See also Practicing Law Institute, Basic Labor Relations c. 11, at 297 et seq. (1981). In *Vaca* v. *Sipes*, 386 U.S. 171, 190 (1967), it was stated that a "breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." The decision then discussed the extent to which a union is bound to seek arbitration, the final stage of prosecuting an employee grievance, and said (at 191), "Though we accept the proposition that a union may not *arbitrarily ignore a meritorious grievance or process it in perfunctory fashion,* we do not agree that the individual employee has

---

[4] Arbitration on the 1975 grievance had been set for September, 1975, but was postponed by Trainor (as Mrs. Trinque knew from Trainor) until after the arbitration on the 1974 grievance. No new arbitration date was set after the arbitrator's decision of June, 1976. Trainor, she testified, had told her, that he had been "so busy" negotiating a "new contract . . . that he hadn't gotten to it." She then told him that she had engaged a lawyer. Trainor, she said, had suggested that her new counsel attempt to schedule a hearing because the College's representative would only "laugh at" him if he then tried to arrange a hearing.

an absolute right to have his grievance taken to arbitration regardless of the provisions of the applicable collective bargaining agreement" (emphasis supplied). The Court (at 191 to 194) pointed out the unfortunate consequences of failing to give the union, as collective bargaining agent, some control over the grievance process and determined (at 192) "that a union does not [commit a] breach [of] its duty of fair representation, and thereby open up a suit by the employee for breach of contract, merely because it settled [a] grievance short of arbitration." Dealing with the particular facts before it, the Court (at 194) stated that "[t]here was no evidence that any [u]nion officer was personally hostile to . . . [the grievant] or that the [u]nion acted at any time other than in good faith." It also said (at 195) that "a breach of the duty of fair representation is not established merely by proof that the underlying grievance was meritorious."

Cases after the *Sipes* case have not established precisely (see 6 Kheel, Labor Law § 28.04, at 28-53) the standards for appraising whether a union has complied with the duty of fair representation of its members. The *Sipes* case was supplemented by the Supreme Court in *Amalgamated Assn. of St., Elec. Ry. & Motor Coach Employees* v. *Lockridge*, 403 U.S. 274, 299-301 (1971), where the Court (at 301) points out "the need to adduce substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives" and also lays stress on the distinction "between honest, mistaken conduct, on the one hand, and deliberate and severely hostile and irrational treatment, on the other." [5]

---

[5] See also *Hines* v. *Anchor Motor Freight, Inc.*, 424 U.S. 554, 570-571 (1976), where it was said that an employee is not foreclosed from his statutory remedy, "if the contractual processes have been seriously flawed by the union's breach of its duty to represent employees honestly and in good faith and without invidious discrimination or arbitrary conduct." It was also said that "it was anticipated . . . that the contractual machinery would operate within some minimum levels of integrity." There was evidence before the United States District Court in the *Hines* case (at 558-560) that the union had made an inadequate and perhaps perfunctory investigation of charges of serious alleged misconduct by discharged employees.

"A wide range of reasonableness," of course, "must be allowed a . . . bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." *Ford Motor Co.* v. *Huffman,* 345 U.S. 330, 338 (1953). Although ordinary negligence may not amount to a denial of fair representation, lack of a rational basis for a union decision and egregious unfairness or reckless omissions or disregard for an individual employee's rights may have that effect. See *Robesky* v. *Qantas Empire Airways, Ltd.,* 573 F.2d 1082, 1088-1091 (9th Cir. 1978).[6]

2. The principles of *Vaca* v. *Sipes,* 386 U.S. 171, *supra,* have been accepted and applied to some extent in Massachusetts. *Norton* v. *Massachusetts Bay Transp. Authy.,* 369 Mass. 1, 2 (1975). *Balsavich* v. *Local Union 170, Intl. Brotherhood of Teamsters,* 371 Mass. 283, 286-287 (1976). *Berman* v. *Drake Motor Lines, Inc.,* 6 Mass. App. Ct. at 444-445. In the *Berman* case, the rule was stated (at 445), "Violation of the union's duty of fair representation is established only when the plaintiff produces *substantial evidence* of arbitrary, bad faith, or discriminatory conduct in the union's representation of his grievance" (emphasis supplied). The court went on to hold (at 445-446) that a possible "judgmental error" could not be treated as "the equivalent of arbitrary, bad faith, or discriminatory representation."[7]

---

[6] There appears to be some disagreement among the circuits as to whether and to what extent unintentional conduct can amount to bad faith. See *Mavis* v. *Brotherhood of Ry., Airline & S.S. Clerks,* 585 F.2d 926, 931 (8th Cir. 1978), but see, from a different panel in the same circuit, *Ethier* v. *U.S. Postal Serv.,* 590 F.2d 733, 736-737, cert. denied, 444 U.S. 826 (1979); *Wyatt* v. *Interstate & Ocean Transp. Co.,* 623 F.2d 888, 891 (4th Cir. 1980); *Findley* v. *Jones Motor Freight, Div., Alleghany Corp.,* 639 F.2d 953, 957-961 (3d Cir. 1981). As to negligent failure of union representatives to notify employees of risks of lay-offs which had become apparent in the course of negotiations, see *Warehouse Union Local 860* v. *National Labor Relations Bd.,* 652 F.2d 1022, 1024-1025 (D.C. Cir. 1981).

[7] Although *Vaca* v. *Sipes* was cited in *Massachusetts Elec. Co.* v. *Massachusetts Commn. Against Discrimination,* 375 Mass. 160, 174-175 (1978), the issues presented in the case now before us were not discussed.

3. We apply the principle stated in the *Berman* case (the Massachusetts case most similar to the facts of the present case), and test the evidence to determine whether it amounts to substantial evidence of arbitrary, bad faith, or discriminatory conduct by the Association. That evidence discloses cordial and cooperative representation of Mrs. Trinque by the Association, its officers (apparently without compensation), and Robreno with respect to the 1974 grievance at least until the summer of 1975. MTA procured Mr. Egan, an experienced attorney, to represent her (at no expense to her) in the arbitration of the 1974 grievance, during which evidence was received on February 6 and March 12, 1976. The arbitrator's report shows a full and careful examination of the evaluations of Mrs. Trinque which preceded the decision not to renew her contract for another year. The determination by the arbitrator and the limited remedy granted by him were within the powers given to him by the collective bargaining agreement. See *Commissioners of Middlesex County v. AFSCME Local 14*, 372 Mass. 466, 468-469 (1977). We view Mrs. Trinque's contentions that the Association (a) did not call all witnesses suggested by her or (b) press various assertions by her of alleged displays of bias against her by College officers, as essentially "judgmental" decisions of the Association's representatives and of her lawyer, Mr. Egan, about the best method of protecting her interests.

Mrs. Trinque's most significant contention is that other professors in the College (Tandy, Leasure, Trainer, and Filteau, the last two of whom had acted for Mrs. Trinque as officers of the Association) also themselves had in 1974 filed grievances under the collective bargaining agreement. Mrs. Trinque had testified that one of them had admitted that their grievances were essentially the same as hers. It could have been found on Mrs. Trinque's indefinite testimony that she did not learn before the autumn of 1975 (and perhaps even later) that the grievances of the other faculty members had been disposed of by a settlement with the College which involved the discontinuance of the grievances by the tenured grievants and the withdrawal of the 1974 evaluations

by the College, recorded by a memorandum dated July 23, 1975. There was testimony that Mrs. Trinque had been offered the opportunity to have her 1974 evaluations removed from her file if she would resign, but that she was not interested in such a compromise, essentially because her desire was to get her job back for the ensuing year. The other professors (who settled their grievances by having their evaluations removed from their files) all had tenure while Mrs. Trinque did not have that protection. Those tenured professors could not be discharged except for cause and their situation could not have been improved if their grievances had been pushed further than the College itself.

The evidence that the Association settled similar claims of two then or former officers of the Association as they did on July 23, 1975, without settling Mrs. Trinque's grievance, might not be impressive to us if we were deciding the facts. We well might feel that the Association had a reasonable basis for differentiation in the treatment of (a) Mrs. Trinque's grievance as a nontenured teacher seeking reinstatement, and (b) the somewhat similar grievances of the professors with tenure. We might give greater weight to the practical problems and difficulties of union representation of employees in grievance matters (see *Findley* v. *Jones Motor Freight, Div., Alleghany Corp.,* 639 F.2d 953, 958-961 [3d Cir. 1981]). If so, we might have felt that the evidence was not sufficiently substantial to take the Association's performance outside the wide "range of reasonableness" mentioned in the *Ford Motor Co.* case, 345 U.S. at 338, and in the *Hines* case, 424 U.S. at 563-564.

The jury, however, were the triers of the facts. They heard and saw the witnesses. They could give weight to such evidence as there was of hostility to Mrs. Trinque within the faculty and to the Association's failure to press her 1975 grievance at an earlier date. The jury could decline to believe the witnesses who stated the Association's position, especially the testimony that she also had been offered the chance to have her 1974 evaluations removed. We are constrained to hold that, in the circumstances, the trial judge

properly left to the jury the decision whether there was substantial evidence of bad faith or discriminatory conduct in the Association's representation of Mrs. Trinque.

*Judgment affirmed.*