573 A.2d 835

**SUBURBAN HOSPITAL, INC.**

v.

**William DWIGGINS.**

**No. 1344, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

May 30, 1990.

98

George P. Haldeman (Adelman & Haldeman, on the brief), Rockville, for appellant.

Theresa M. Hall (Durke G. Thompson and Goldberg, Thompson, Pasternak & Fidis, P.A., on the brief), Bethesda, for appellee.

Argued before WILNER, BISHOP and ROSALYN B. BELL, JJ.

WILNER, Judge.

William Dwiggins was an employee of Suburban Hospital, Inc. On September 26, 1985, he was discharged by his supervisor for allegedly violating a specific condition of his employment. Invoking the hospital's grievance procedure, Dwiggins presented his case to various hospital personnel, including a four-member grievance panel. The panel, on disputed evidence, concluded that Dwiggins had violated the condition and that discharge was an appropriate sanction. The hospital administrator concurred in those findings, thereby effectuating the discharge.

Mr. Dwiggins filed suit in the Circuit Court for Montgomery County against the hospital and its associate administrator, Paul Quinn. He charged the hospital with breach of contract and the somewhat nebulous tort of breaching a duty of fair dealing by denying him due process; he charged Quinn with defamation by publishing untrue statements concerning Dwiggins's abilities and performance. The tort action against the hospital and the action against Quinn were dismissed on motion. The breach of contract count was submitted to a jury, which returned a verdict in Dwiggins's favor in the amount of the wages he lost from the time of his discharge until he found reemployment a year later, in September, 1986. The hospital has appealed from the judgment of $31,259 against it in the contract action; Dwiggins has cross-appealed from the dismissal of his action against Quinn. We shall vacate the former and affirm the latter.

### Background

Mr. Dwiggins was first employed in 1975 as a carpenter. In 1982, he was promoted to a supervisory position. His

annual evaluations in 1983 and 1984 indicate that his then-supervisor, Larry Emory, regarded his performance as of the highest quality.

During the period 1981–83, the hospital adopted and published a number of personnel policies. In 1981, it promulgated a set of written policies dealing with disciplinary action and grievances. The statement on grievances declared that it was the hospital's policy to assure fair and equitable treatment to its employees and that, if an employee felt that an injustice had been done, he or she "may initiate a grievance as outlined below." The formal grievance procedure created by this policy statement contains six steps, beginning with the immediate supervisor and ending with presentation of the grievance to an "ad hoc grievance committee" (Step 5) and ultimately to the hospital administrator (Step 6).

The ad hoc grievance committee is to consist of four persons, two selected by the employee and two selected by the supervisor. The parties are permitted to choose "any employee of the hospital they wish to serve on the committee." The director of personnel serves as chairman of the committee but may not vote except in case of a tie. The grievance committee is directed to "review the grievance and within two working days inform both parties to the grievance of its decision, in writing." Nothing is said in the policy statement about how a "hearing" before the committee is to be conducted, other than that the director of personnel will determine the time and place of the committee meeting.

In 1982, a more general policy on employee relations was adopted by the hospital. It stated, in relevant part, that the hospital "voluntarily assumes a direct and continuing obligation to protect the privileges, interests and benefits of its employees" and that, to address these and other objectives, the hospital "subscribes to the code of employee relations set forth below." Among the provisions of that code were statements that the hospital "shall establish written work performance and on-the-job behavior standards which shall

be expected from an employee" and "shall permit and encourage" employees to present grievances and "assure" that such grievances "will be dealt with at successively higher levels of management in accordance with an established, written procedure."

Finally, for our purposes, in 1983, the hospital adopted a written policy with respect to reinstatement. The introductory paragraph of the document stated that "[r]einstatement is an offer and acceptance of any position within six months of separation from the hospital." This is restated in the body of the policy statement: "A position is offered to a former employee and the employee accepts the conditions of reinstatement."

Dwiggins's first run-in with hospital management occurred in the spring of 1985 and concerned the construction of a wall in one of the hospital corridors. The county code required a building permit for the wall, but, when Dwiggins applied for one on May 30, it was denied because the plans were not sufficiently detailed. It is not clear from the record who was responsible for preparing adequate plans. Dwiggins was instructed by his immediate supervisor, Mr. Emory, to make the necessary changes in the plans and resubmit them to the county on Monday, June 3. Instead, Dwiggins proceeded with the construction over the Memorial Day weekend. In the course of the construction, Dwiggins discovered that the plans called for the wall to block access to an elevator; to avoid that, he *sua sponte* altered the plan by moving the wall a few inches and creating a dogleg.

When Mr. Quinn returned to work on June 3 and discovered what Mr. Dwiggins had done, he concluded that Dwiggins had acted inappropriately in four respects: (1) constructing the wall without "Administration approval"; (2) proceeding without a building permit; (3) expending "outside contractor funds" without "Administrative authorization"; and (4) neglecting to inform the laboratory of the project so that it could move or cover its equipment. Quinn thought the transgressions serious enough to suspend

Dwiggins for three days and recommend his termination thereafter. Dwiggins filed a grievance. Although he asserted that the reasons given by Mr. Quinn were "inaccurate," he did not indicate in what way they were inaccurate; his grievance was based primarily on the argument that, as this was his first offense, the recommended penalty was too severe.

The grievance was eventually considered by a grievance committee, which concluded that, as to the first two charges, Mr. Emory, rather than Mr. Dwiggins, was the culpable agent, but that Mr. Dwiggins should have given advance notice to the laboratory and should not have made any change in the plans without consulting Mr. Emory. By unanimous vote, the committee recommended that Dwiggins be reinstated on probation, subject to a number of conditions. The hospital administrator reviewed the findings of the grievance committee and concurred in its recommendations. She wrote to him, in relevant part:

"Three conditions must be met by you with the acceptance of this reinstatement. They are as follows:

1. Written guidelines will be established for project work which you must agree to follow until department policies are written.

2. You will be placed on probation from July 1 through December 31 *with the understanding that any violations of the written guidelines will be grounds for immediate termination.*

.    .    .    .    .

If you accept the above conditions, please call Mr. John Marynowski, your new supervisor, and arrange your return. Upon your return, I would like you to bring me a signed copy of this letter."

(Emphasis added.) At the bottom of the letter was the statement, "I accept the three conditions of reinstatement as listed above, and will plan to return to work on July 2, 1985," under which was a signature and date line.

Dwiggins signed the letter and returned to work. He also signed another document captioned "Performance Conditions," making clear, among other things, that "[n]o outside contractor can be engaged without signed approval from Administration" and that "[f]ailure to comply with any of these provisions during the probationary period will result in immediate termination." A month later, he received a memo from Mr. Marynowski dealing with purchase orders. It stated, in relevant part, that Dwiggins could sign purchase orders for material being requested by maintenance personnel, that the purchase order would then have to be signed by Marynowski, and that any item over $500 had to be approved by hospital administration.

On September 6, 1985, Mr. Marynowski delivered a written warning to Mr. Dwiggins, resulting from what Marynowski regarded as "poor judgment in job planning and supervision in completing the renovation of radiology and the installation of the dishwasher. . . ." The work, he complained, was poorly coordinated and was completed a week late. On September 26, Marynowski decided to discharge Dwiggins for further misadventures in the renovation of the radiology department. Specifically, he charged that, in direct violation of both the reinstatement condition precluding the engagement of outside contractors without Administration approval and the purchase order policy, Dwiggins had "engaged an outside contractor (Peak Sheet Metal) without signed approval from Administration."

Once again, Mr. Dwiggins invoked the grievance procedure, contending that the charge was untrue—that he had not hired any outside contractors. The charge and the defense were presented in Step 4 of the grievance procedure to the Personnel Relations Coordinator who, in a Memorandum of October 17, 1985, found that Dwiggins had indeed engaged the contractor in violation of the condition of his reinstatement agreement. Specifically, he found:

"During the week of August 18, 1985, Bill Dwiggins engaged Peak Sheet Metal to do the duct work in the Radiology Waiting Room without signed approval from

Administration. This violation of his reinstatement condition was discovered when the Suburban Hospital Purchase Order # M–4564 was submitted for payment, along with the Peak Sheet Metal Invoice # 1021 for the duct work completed by Peak Sheet Metal. There is no evidence that any prior signed approval was obtained from Administration to have this job done by an outside Contractor (Peak Sheet Metal)."

The Coordinator also noted that Dwiggins was then on probation and that the performance conditions promulgated pursuant to the reinstatement agreement made clear that the violation of any of the conditions of reinstatement "will result in immediate termination."

The grievance was then presented to a four-member grievance committee. The proceedings before that committee were not recorded. It appears, from what we were told at oral argument, that, although Dwiggins made a presentation and was permitted to present to the committee a letter from Al Peak of Peak Sheet Metal, he was not allowed to call Mr. Peak as a witness. There is nothing in the record showing any request to call Mr. Peak as a witness. The letter, addressed to Mr. Dwiggins, states:

"In response to your request for information concerning dates about work to be performed on C Wing and Dr. Farney's office my calendar shows that I walked C Wing area, reception area, corridor area in front of small elevator with Larry Emery [sic] and you and at that time gave estimate not to exceed $3,000.

At that time I was told to do the job to be coordinated by you and you would be in touch. Job was done to your schedule with the exception of one diffuser, which is a wholesale problem that they could not deliver on time."

In terms of the critical issue of who actually employed Peak—Dwiggins or Emory—the letter is unclear and therefore of little assistance.

After considering the disputed evidence as to whether Dwiggins or someone else employed Peak to do the job, the

committee unanimously decided that Dwiggins was responsible. The specific finding in that regard was:

"Although Bill Dwiggins indicated he did not call in Peak Sheet Metal to do the work on the Radiology department, the committee felt that the contractor would not have come in to do the work on his own—someone had to contact them and since the project was Bill's responsibility then it was his responsibility to bring them in. In light of the reinstatement agreement it was Bill's responsibility to get written prior approval to bring in the contractor to do the work."

The committee thus concluded that Dwiggins had violated the condition and that the termination should stand. The hospital administrator then reviewed the committee's findings and recommendation, along with a letter from a lawyer for Dwiggins, and decided to uphold the termination.

In his amended complaint, Dwiggins characterized these proceedings as follows:

"On or about September 26, 1985, following two unfounded reprimands at the direction of Defendant Paul Quinn, Plaintiff was terminated based upon untrue allegations of failure to comply with the unlawful restrictive conditions of his reinstatement. Another grievance hearing was requested and held with inconclusive results as there was insufficient evidence to reach any reasonable result. Nevertheless, the termination of Plaintiff was upheld by Defendant Suburban Hospital."

Dwiggins complained that Quinn and the hospital "did not allow any decisive action by the Grievance Committee and wrongfully exercised authority over the grievance process to the serious detriment of Plaintiff" and that Quinn "maliciously and wantonly failed to give Plaintiff adequate warning or notice of cause for discharge or provide Plaintiff with an opportunity to substantivally [sic] respond to any causes for discharge or to be given a hearing thereon...." Through such conduct, he said, the hospital "breached its contractual duty to the Plaintiff by denying to Plaintiff the rights arising from Defendant's establishment of and Plain-

tiff's reliance upon said Grievance Committee procedures in continuing his employment with the Defendant Hospital and by wrongfully discharging Plaintiff."

The case was presented to the jury on a straight breach of contract basis, the threshold issue being whether the reinstatement agreement modified the initial at-will nature of Dwiggins's employment. The jury was instructed that, if it found that a contract was created that modified the at-will nature of Dwiggins's employment and limited the hospital's discretion in terminating his employment, it should consider then whether the hospital breached that contract by discharging him. The jury obviously found that a contract had been created and breached.

In this appeal, the hospital urges, first, that the evidence was insufficient to establish the existence of an enforceable contract, and second, that if there was such a contract, the period of contractual employment extended only through the probationary period (December 31, 1985), and thus damages should have been limited to that period. Mr. Dwiggins, as we observed, complains about the dismissal of his action against Mr. Quinn.

## Breach of Contract

The hospital's position is that Mr. Dwiggins was an at-will employee when he was hired, that that circumstance never changed, and that the reinstatement agreement simply set forth the conditions of his probation and was never intended to give him greater protection than he had before he was reinstated. Expanding somewhat the theory set forth in his amended complaint, Dwiggins now maintains that his initial at-will status was changed not just by the July, 1985 reinstatement agreement but also by the various personnel policies adopted by the hospital.

All of this proceeds from two underlying legal precepts. The first, of some duration and confirmed recently in *Adler v. American Standard Corp.*, 291 Md. 31, 35, 432 A.2d 464 (1981), is that "an employment contract of indefinite dura-

tion, that is, at will, can be legally terminated at the pleasure of either party at any time." The second, of more recent origin, is that "employer policy directives regarding aspects of the employment relation become contractual obligations when, with knowledge of their existence, employees start or continue to work for the employer." *Dahl v. Brunswick Corp.*, 277 Md. 471, 476, 356 A.2d 221 (1976). In *Staggs v. Blue Cross of Maryland*, 61 Md.App. 381, 486 A.2d 798 (1985), we applied this second principle to provisions in an employer's personnel handbook that, at least facially, appeared to limit the employer's discretion to discharge employees at will. At 392, 486 A.2d 798, we held that: "[P]rovisions in such policy statements that limit the employer's discretion to terminate an indefinite employment or that set forth a required procedure for termination of such employment may, if properly expressed and communicated to the employee, become contractual undertakings by the employer that are enforceable by the employee."

It is the application of this second principle that is at issue here. In particular, the threshold questions before us are these: (1) did the hospital, through policy directives or otherwise, contractually modify the at-will nature of Mr. Dwiggins's employment by limiting in some way its discretion to discharge him at any time and for any otherwise permissible reason; (2) if so, what limitations did it place on itself; and (3) to the extent that there is a dispute as to whether the hospital exceeded those limitations and thus discharged Mr. Dwiggins in violation of its contractual undertaking, in what forum is that dispute to be decided? We shall address these questions *seriatim*.

### Contract Vel Non

The parties seem to agree that, when Mr. Dwiggins was first employed in 1975, he was an at-will employee. If there was a contractual modification of that status, it must come from one or both of two sets of documents: the personnel policy statements or directives promulgated by the hospital between 1981 and 1983, and the reinstatement

agreement, coupled with the job performance conditions, that became effective in July, 1985.

In the general policy statement on employee relations, the hospital stated that it was "assum[ing] a direct and continuing *obligation* to protect the privileges, interests and benefits of its employees." (Emphasis added.) To address its objectives, it "subscribe[d]" to the ensuing code, which included provisions for written work performance and job behavior standards as well as a grievance procedure for resolving disputes. Specific policy statements set forth, in greater detail, the grievance mechanism, the types of disciplinary actions that might be taken, and a policy on reinstatement that speaks in terms of "an offer and acceptance." These policy statements were published and circulated to all of the hospital employees, including Mr. Dwiggins. Unlike the situation in *Castiglione v. Johns Hopkins Hosp.*, 69 Md.App. 325, 517 A.2d 786 (1986), *cert. denied* 309 Md. 325, 523 A.2d 1013 (1987) and *Fournier v. USF & G*, 82 Md.App. 31, 569 A.2d 1299 (1990), there is no disclaimer in any of these published written documents, or in any other document, indicating an intent on the hospital's part that these undertakings not be regarded as contractual in nature.

The reinstatement agreement certainly was a contractual undertaking. It was a signed written document in which the hospital and Dwiggins agreed to a continuation of Dwiggins's employment under certain specific conditions. Considering that agreement together with the underlying policies that authorized and led to it, we have no hesitation in concluding that the hospital did, in fact, contractually limit its otherwise vast discretion to discharge Mr. Dwiggins at any time and for any reason.

### Nature of the Limitations

Two kinds of limitations emerge from these documents. One, which is not really disputed by the hospital, is the grievance procedure—the provision of a mechanism by which an employee could contest disciplinary actions,

including terminations. In creating such a dispute resolution mechanism and committing itself to abide by it, the hospital necessarily ceded a certain measure of its discretion to make snap and final judgments in this area.

The second kind of limitation is more substantive than procedural. In its general policy statement, the hospital agreed to establish written work performance and job behavior standards for its employees. It particularized that undertaking with respect to Mr. Dwiggins in the reinstatement agreement, and, pursuant to that agreement, it did in fact promulgate written "performance conditions" which both Mr. Dwiggins and Mr. Marynowski signed. In agreeing to do that and then doing it in fact, the hospital implicitly, but contractually, assured Mr. Dwiggins that he would not be disciplined for job conduct that was consistent with and not violative of those conditions. If this were not so—if the undertaking did not have that effect—it would be merely a sham, and there is no evidence that the hospital ever intended it as such.

### The Dispute Resolution Forum

Until about 25 years ago, American courts had come to treat with veneration the common law principle that, absent some explicit contract or statute indicating otherwise, an employment that had no fixed term was at will and that either party could, with impunity, terminate it at any time and for just about any reason. It appears, however, that this veneration may have been misplaced. Professor Clyde W. Summers, of the University of Pennsylvania Law School, has informed us that the rule did not come from the English common law, but was invented by American scholars. In his article, *Individual Protection Against Unjust Dismissal: Time for a Statute*, 62 Va.L.Rev. 481, 485 (1976), he wrote:

"The American rule apparently was first announced a hundred years ago by a treatise writer who cited as authority four cases, none of which supported him. Despite its doubtful antecedents, the rule was embraced by

American lawyers and judges, and within thirty years the employer's unrestrained freedom to discharge was transmuted into a constitutional right."

Although any constitutional protection supposedly given this right, for which *Adair v. United States,* 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436 (1908) is cited, was stripped away in *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), its life as a pillar of the common law remained pretty much intact for another 30 to 40 years. In the 1960's and 1970's, a number of commentators began decrying the unfairness of the doctrine to employees and suggesting various remedial measures, some tort-based, some based on expanded or more fluid notions of contract law. *See, for example,* L. Blades, *Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power,* 67 Colum.L.Rev. 1404 (1967); Note, *Implied Contract Rights to Job Security,* 26 Stan.L. Rev. 335 (1974); C. Summers, *supra,* 62 Va.L.Rev. 481 (1976); Note, *Protecting at Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith,* 93 Harv.L.Rev. 1816 (1980).

Whether in response to articles such as these or upon their independently formed sympathetic views, courts did begin to fashion a number of direct and indirect limitations on the employer's discretionary right to discharge at-will employees. They took a number of forms—recognizing a tort of abusive discharge, implying a covenant on the part of employers to deal with at-will employees in good faith, or, as the case here, finding some sort of "implied-in-fact" contractual or quasi-contractual limitations based on employer-generated personnel policies. *See* Annotation, *Modern Status of Rule that Employer May Discharge At–Will Employee for Any Reason,* 12 A.L.R. 4th 544 (1982); H. Perritt, Jr., *The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie?,* 58 Cinc.L.Rev. 397 (1989). One of the consequences of this development was to open the courts to a new class of litigation that, if

not circumscribed by behavioral or institutional constraints, could prove to become a serious problem.[1]

Maryland, of course, has recognized both the tort of abusive discharge and the possibility that contractual rights may emanate from employer-generated personnel policy statements, clearly expressed and communicated to the employees. As to the former, the Court of Appeals has carefully limited access to the courts by aggrieved employees; not only is the tort itself tightly circumscribed, but where an alternative statutory remedy for abusive discharge exists, the common law court action is unavailable. *See Makovi v. Sherwin–Williams Co.*, 316 Md. 603, 561 A.2d 179 (1989).

Actions founded on the *Dahl/Staggs* analysis take the form of traditional breach-of-contract claims in which the court is asked to declare the existence of the contract, define its terms, decide the nature and extent of its breach, and ascertain the damage flowing from the breach. These tend to be but a sub-class of discharge disputes. In many instances, these kinds of disputes arise under agreements, either collective bargaining or individual, that call for arbitration, and, where that is the case, the breach-of-contract action is, in most instances, unavailable. *See Wilson v. McGrow, Pridgeon & Co., P.A.*, 298 Md. 66, 467 A.2d 1025 (1983); *Anne Arundel County v. Fraternal Order*, 313 Md. 98, 543 A.2d 841 (1988).

The *Dahl/Staggs* cases ordinarily come to the court directly because (1) the employer has denied that there was any contractual modification of the at-will employment and (2) in part because of that, there is no clear agreement to

---

1. Some of the commentators recognized that a dismantling of at-will employment would necessitate the creation of an alternative dispute resolution mechanism and suggested either required binding arbitration of discharge disputes or their submission to governmental fair practice commissions. *See* L. Blades, *supra,* 67 Colum.L.Rev. at 1433; C. Summers, *supra,* 62 L.Va.L.Rev. at 521 *et seq.* Others simply assumed that employers would act responsibly and that most of the few claims that developed would be settled. *See* Note, *supra,* 93 Harv.L.Rev. at 1842.

submit the dispute to arbitration or other binding dispute resolution process. In such cases, absent some other bar to judicial relief, it is ordinarily incumbent upon the court to determine whether the policy statements or other documents posited by the employee suffice as a contractual modification of the at-will nature of the employment and, if so, the extent of the modification. There may be no other forum in which to resolve those issues.

Here, part of the contract alleged by Mr. Dwiggins was the creation and availability of an in-house grievance procedure, the last step of which was declared to be "final". The hospital did not dispute the existence of that procedure. It was available and it was used. What Dwiggins, in effect, asked the court to do was to relitigate the issue that had been submitted to the grievance mechanism and to substitute its judgment for that of the grievance committee and, ultimately, the hospital administrator. Whether he has a right to *that* is something we need to examine.

Under Federal labor law and policy, where a grievance mechanism is established under a collective bargaining agreement, decisions made through that process cannot be relitigated in court unless the employee can show that the process itself has somehow been subverted, usually by establishing a failure of the union to provide fair representation. In establishing this principle in *Hines v. Anchor Motor Freight*, 424 U.S. 554, 571, 96 S.Ct. 1048, 1059, 47 L.Ed.2d 231 (1976), the Court held:

> "Petitioners are not entitled to relitigate their discharge merely because they offer newly discovered evidence that the charges against them were false and that in fact they were fired without cause. The grievance processes cannot be expected to be error-free. The finality provision has sufficient force to surmount occasional instances of mistake. But it is quite another matter to suggest that erroneous arbitration decisions must stand even though the employee's representation by the union has been dishonest, in bad faith, or discriminatory; for in that event error and injustice of the grossest sort would

multiply. The contractual system would then cease to qualify as an adequate mechanism to secure individual redress for damaging failure of the employer to abide by the contract."

*See also Bowen v. United States Postal Service,* 459 U.S. 212, 223, 103 S.Ct. 588, 595, 74 L.Ed.2d 402 (1983); *Huffman v. Westinghouse Elec. Corp.,* 752 F.2d 1221, 1223 (7th Cir.1985).

This approach is consistent with the limited role of courts in reviewing the decisions of both arbitrators and administrative agencies. Indeed, the courts have treated grievance committees created pursuant to employment agreements as the equivalent of arbitrators. *See Truck Drivers Union v. Riss & Co.,* 372 U.S. 517, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963); *Fulghum v. United Parcel Service, Inc.,* 424 Mich. 89, 378 N.W.2d 472 (1985); *United Mine Workers, etc. v. Barnes & Tucker Co.,* 561 F.2d 1093 (3d Cir.1977); *Stigliano v. St. Rose High School,* 198 N.J.Super. 520, 487 A.2d 1260 (App. Div.1984). The *United Mine Workers* Court made the point, 561 F.2d at 1096:

"It is not arbitration per se that federal policy favors, but rather final adjustment of differences by a means selected by the parties. If the parties agree that a procedure other than arbitration shall provide a conclusive resolution of their differences, federal labor policy encourages that procedure no less than arbitration. A determination made pursuant to that chosen procedure is no less enforceable in a federal court than is an arbitration award."

Under this approach, the court essentially looks to make sure that the process chosen by the parties or mandated by law was fundamentally fair and that the rules governing it were observed; if so, it defers to the decision reached through that process. Two cases illustrate how this principle has been applied in grievance procedure cases not involving pure binding arbitration.

In *Berman v. Drake Motor Lines, Inc.,* 6 Mass.App. 438, 376 N.E.2d 889 (1978), an employee covered by a collective

bargaining agreement was discharged. The labor agreement gave jurisdiction over disputes and grievances to a permanent joint committee, to which the union and management appointed an equal number of members, and provided that a decision by the committee would be final and binding. The employee presented his grievance to the committee; after a hearing at which he was allowed to state his position, the committee denied the grievance. The employee then brought suit for breach of contract. 376 N.E.2d at 892, the Court stated the general rule it intended to apply:

"Although State courts have jurisdiction to entertain actions for damages for the wrongful termination of employment covered by a labor agreement, ... they will ordinarily not exercise such jurisdiction until the grievance procedures provided for in the labor agreement have been exhausted.... Courts in turn should not undertake to review the merits of the grievance decision rendered by the arbitrator.... The courts do, however, retain the power and obligation to determine whether the grievance decision has been rendered in a procedurally fair manner.... If the court finds that the grievance process has been undermined by unfair procedure or misconduct of the parties, then the employee is relieved of the finality of the arbitrator's decison and may proceed with his action to recover damages for his allegedly wrongful discharge."

(Citations omitted.)

Mr. Berman challenged the grievance decision on three bases, one being that, because it consisted of equal representation from union and management, the committee was not impartial. As to that, the Court held, 376 N.E.2d at 893: "The committee involved in this case is identical in structure and function to other arbitration tribunals created for the resolution of contractual disputes under various labor agreements. The courts have consistently deferred to decisions rendered by such committees as final and binding determinations of contractual issues." Berman complained also that the grievance committee exceeded its authority

and that the procedures it used were illegal and fraudulent. The court reviewed those challenges as well, but found no merit in them. Having disposed of all attacks on the procedure itself, the court affirmed the summary judgment dismissing the action. There was to be no trial on the merits. *See also Trinque v. Mount Wachusett Com. College, etc.*, 14 Mass.App. 191, 437 N.E.2d 564 (1982).

In *Renny v. Port Huron Hosp.*, 427 Mich. 415, 398 N.W.2d 327 (1986), a nurse was discharged for intimidating another hospital employee, an accusation that she denied. She pursued her grievance through the established grievance procedure, and, when that proved unavailing, she sued the hospital for breach of contract. Among other defenses, the hospital contended that she should be bound by the decision of the grievance panel. In considering that argument, the Court held, 398 N.W.2d at 329, that, where the employer has given up the right to terminate at will,

"a private employer cannot insulate itself from judicial review of an employee's discharge by unilaterally establishing [a] method of dispute resolution to which the employee must submit.

However, where an employee has expressly consented to submit a complaint to a joint employer-employee grievance board established by the employer with the knowledge that the resulting decision is final and binding, the decision shall be final unless the court finds as a matter of law that the procedures used did not comport with elementary fairness. If the court so finds, the merits of the case may be submitted to the jury to determine if, in fact, the employee was fired for just cause."

The existence of elementary fairness, the Court held, was to be determined in accordance with the standards applicable to giving conclusive effect to administrative determinations, as set forth in *Restatement (Second) of Judgments* § 83(2). *Id.* at 338. One of those standards requires that the party have had the right to present evidence and legal argument and a fair opportunity to rebut evidence and argument by opposing parties. That is what the Court

found lacking in the case before it. Although the nurse could pick the members of the grievance board from a list of "qualified" hospital employees, she was not permitted counsel, she was not allowed even to see the complaint against her, she was not informed of the identity of the witnesses testifying against her, she could not be present during their testimony and therefore had no right to cross-examine them, and she had no right to rebut the evidence against her or make any closing or summary statements. Not surprisingly, the Court found a lack of elementary fairness in the procedure and thus concluded that she was not bound by the outcome.

See also *Personnel Bd. of Jefferson County v. Bailey*, 475 So.2d 863 (Ala.Civ.App.1985) and *Fink v. Metropolitan Dade County*, 403 So.2d 1060 (Fla.Dist.Ct.App.1981), restricting judicial review of grievance determinations to whether the official, agency, or committee had jurisdiction of the matter and whether the evidence before it sufficed to support its findings.

We believe that this approach is not only a sound one, conformable with well-established principles of judicial review, but, unless we are prepared to open the courts to a potential avalanche of workplace disputes, a necessary one as well. If, as part of the contract governing the employment, the parties have agreed to submit disputes arising under that contract to a grievance procedure that is fair and to be bound by the decisions reached through that procedure, they should be held to that agreement. The court's role, in this regard, should be limited to examining whether the procedure was, in fact, available and fundamentally fair and whether the agreed-upon rules governing it were substantially followed. If it finds those things to be so, it should dismiss the complaint. To do otherwise would permit the plaintiff to enforce one part of the alleged contract and repudiate another. In this regard, we would observe that in-house grievance proceedings are intended to be informal. They need not include all the trappings of formal court proceedings in order to be regarded as fundamentally

fair.   What they *must* provide, however, are (1) an impartial fact-finding tribunal and (2) a reasonable opportunity for the employee to present his case and to challenge and rebut the case against him.

■  Although his amended complaint is not very specific in this regard, Mr. Dwiggins complains now that the grievance procedure afforded him was not fair in at least one respect.   The issue of whether it was he or someone else who engaged Peak Sheet Metal became one of credibility. Dwiggins asserts that Mr. Quinn gave false testimony before the grievance panel and misrepresented the import of certain documents;  he also claims that he was not permitted to call Mr. Peak as a witness.   Because the case was tried as a straight breach-of-contract action, the court did not focus on the fairness of the grievance proceeding and made no findings on that issue.   But, under the approach we adopt and apply today, that was a threshold issue for the court to determine, for, if it had concluded that the proceeding was fundamentally fair and that the rules governing it were substantially followed, the grievance mechanism's decision on the merits of the dispute should have been accepted and not submitted for *de novo* resolution by the jury.

We shall therefore vacate the judgment entered in favor of Mr. Dwiggins and remand the case for a new evidentiary hearing on that issue.   If the court finds that the proceeding was fundamentally fair and that the rules governing it were substantially followed, it should dismiss the action against the hospital.   If it finds to the contrary, then submission of the case to the jury was appropriate and the court should reinstate the judgment.

### Damages

■  The second complaint made by the hospital in this appeal is that any damages flowing from a breach of contract should be limited to Mr. Dwiggins's loss of income from the effective date of discharge through December 31,

1985. It reasons that, if the contract creating its liability arises from the reinstatement agreement, that agreement lasted only during the six-month probationary period which ended on December 31, and the hospital therefore had no contractual obligation to Mr. Dwiggins thereafter.

This issue would, of course, become moot if the court decides to abide by the grievance procedure decision. But that is not a certain conclusion, and so we shall address the complaint. We find it without merit. The hospital has misconstrued the underlying contract as well as the reinstatement agreement. Its obligation to Mr. Dwiggins did not end with the probationary period. The standards set out for him were pursuant to obligations it undertook in its general personnel policy statement and were to govern his employment generally. If the jury verdict is reinstated, therefore, it may be reinstated in full.

### *Cross–Appeal*

██ As we observed, in addition to his breach-of-contract action against the hospital, Mr. Dwiggins sued Paul Quinn for defamation. In Count III of his original complaint, he alleged that "[f]rom approximately May 1, 1985 through September 26, 1985, the Defendant Paul Quinn did publish untrue oral and written statements concerning the abilities and performance of the Plaintiff...." The complaint was filed on June 5, 1987, and it was therefore apparent on its face that the defamation claim was not filed within the one-year period of limitations applicable to such claims. *See* Md.Cts. & Jud.Proc.Code Ann. § 5–105.

Quinn responded to this claim with a motion to dismiss on the ground that "there are no specific acts of libel alleged" and that he was "unaware of what the libelous statements were and when they were made." The defense of limitations, though obvious from the complaint itself, was not raised in the motion.

On November 25, 1987, Dwiggins filed an amended complaint, Count III of which iterated his defamation claim

against Mr. Quinn. Although he was somewhat more specific as to the nature of the defamatory statements and the persons to whom they were directed, he repeated his contention that the publication of those statements occurred between May 1 and September 26, 1985. Quinn again moved to dismiss the action on the ground that the averments were not sufficiently specific. As before, no mention was made of limitations. The motion to dismiss was denied, whereupon, on April 4, 1988, Quinn filed an answer to the amended complaint. In that answer, Quinn asserted, among other defenses, that the complaint failed to state a cause of action on which relief can be granted and that "[t]he Plaintiff's claims are barred by the statute of limitations."

In November, 1987, Quinn (and the hospital) moved for summary judgment on the various claims. Curiously, having raised the limitations problem in their answer, they did not mention it in the motion. On the second day of trial, Quinn filed a second motion for summary judgment in which he specifically contended that the defamation action was barred by the one-year statute of limitations. Dwiggins asserted that Quinn had waived that defense by failing to raise it earlier. The court declined to find a waiver, however, and, as the defense on its merits was patently valid, it dismissed the action against Quinn. In his cross-appeal, Mr. Dwiggins presses his claim that Quinn waived the limitations defense. We agree with the ruling of the trial court.

The only requirement in the Maryland Rules regarding the pleading of limitations is the provision in Md. Rule 2–323(g) that it must be set forth as a separate defense in the answer. That was done here. As the only action against Quinn was the defamation claim in Count III, his joinder in the raising of the limitations defense in the answer was necessarily specific as to that action. Where the limitations defense is apparent from the face of the complaint, it has been held subsumed within the broader defense that the complaint fails to state a cause of action

upon which relief can be granted, and it therefore may be raised under the aegis of that defense in a motion to dismiss under Md. Rule 2–322(b). But the raising of that broader defense through a motion to dismiss is permissive rather than mandatory. See Md. Rule 2–322(b) and the interplay between Rules 2–322(f) and 2–324.

### Costs

In part because we are merely vacating, rather than reversing, the principal judgment and remanding that part of the case for further proceedings which may yet result in a judgment for Mr. Dwiggins, we shall exercise the discretion vested in us by Md. Rule 8–607(a) and direct that each party to this appeal pay his or its own costs and not assess the costs entirely against Mr. Dwiggins.

JUDGMENT ON COUNT I OF AMENDED COMPLAINT VACATED; JUDGMENT ON COUNT III AFFIRMED; CASE REMANDED FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION; EACH PARTY TO PAY OWN COSTS.